1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JAMIE ZIMMERMAN et al,

                Plaintiff,

      v.

PEACEHEALTH et al,

              Defendant.

Case No. 3:22-cv-05960

ORDER ON CROSS MOTIONS FOR
SUMMARY JUDGMENT AND
DEFENDANT'S MOTION TO EXCLUDE
PLAINTIFFS' EXPERT

## I.  INTRODUCTION

In August 2021, as the Delta variant of the COVID-19 virus spread rapidly around the

country, Defendant PeaceHealth, a regional healthcare network, experienced the highest number

of COVID-related hospitalizations since the start of the pandemic. Shortly thereafter,

PeaceHealth began requiring all its employees to be fully vaccinated against COVID-19. That

same month, Washington state also instituted a requirement that all healthcare providers be

vaccinated or seek an exemption. Like the state mandate—and later, the federal government's

similar vaccine policy for healthcare workers—PeaceHealth allowed its employees to request

exemptions and accommodations from the vaccine requirement based on medical or religious

objections.

Plaintiffs are 53 current[1] and former PeaceHealth employees who allege that they requested accommodations for their sincerely held religious objections to being vaccinated; that PeaceHealth could have reasonably accommodated them in a way that allowed them to continue working, such as by requiring them to take additional protective measures or reassigning them to remote work; but that instead, PeaceHealth placed them on indefinite unpaid leave. Plaintiffs also allege other forms of employment discrimination, including that they were disparately treated, disparately impacted, and subjected to a hostile work environment based on their sincerely held religious beliefs.

Before the Court are PeaceHealth's motion for summary judgment on all claims and Plaintiffs' partial motion for summary judgment on their Title VII and WLAD discrimination claims. Dkt. 65, 68. Also before the Court is PeaceHealth's motion to exclude Plaintiffs' expert Dr. Harvey Risch under Federal Rule of Evidence 702. Dkt. 66. Having considered the parties' briefing, oral argument, and the relevant record, the Court concludes that PeaceHealth has demonstrated as a matter of law that accommodating Plaintiffs would have posed an undue hardship to its healthcare system. The Court therefore GRANTS Defendant PeaceHealth's motion for summary judgment and DISMISSES Plaintiffs' claims with prejudice. Plaintiffs' cross-motion for partial summary judgment is DENIED as moot. PeaceHealth's motion to exclude Plaintiffs' expert is also DENIED as moot.

## II.    BACKGROUND

This case arises out of Plaintiffs' requests for accommodations for their religious objections to PeaceHealth's COVID-19 vaccination mandate. The following facts are either not

---

[1] Some of the plaintiffs returned to work at PeaceHealth once the COVID-19 vaccination policy was changed. Dkt. 72 ¶ 28.

genuinely disputed in the summary judgment record or taken in the light most favorable to Plaintiffs, the non-moving party.

Defendant PeaceHealth is a nonprofit Catholic healthcare system with medical centers, critical access hospitals, and clinics located in Washington, Oregon, and Alaska. Dkt. 51 ¶ 4–5; Dkt. 72 at 12. PeaceHealth describes itself as "continu[ing] the healing mission of Jesus Christ" through its guiding vision that "[e]very person receives safe, compassionate care, every time, every touch." Dkt. 72 at 15, 12; *see* Dkt. 51 ¶ 5. As of August 2021, PeaceHealth employed approximately 16,250 caregivers.[2]

Plaintiffs are 53 individuals who worked in PeaceHealth facilities as nurses, technicians, and engineers, among other positions. Dkt. 51 ¶¶ 6–59. All caregivers were employed by PeaceHealth at the time it instituted its vaccination requirement. *See id.*

A. **The COVID-19 pandemic and emergence of the Delta variant.**

In March 2020, the World Health Organization ("WHO") declared the COVID-19 outbreak a pandemic. Dkt. 69 ¶ 14. The primary transmission pathway of COVID-19 is person-to-person via infected respiratory droplets and aerosols. *Id.* ¶ 19. Symptom onset typically occurs within 2–14 days after exposure and is characterized by cough, shortness of breath, fever, and fatigue. *Id.* ¶ 18. But infections can also cause more severe symptoms such as difficulty breathing, low oxygen levels, pneumonia, and other complications, especially among people over the age of 65 or that have preexisting medical conditions. *Id.* With such symptoms, hospitalization may be required. *Id.*

As hospitalizations due to the COVID-19 virus hit PeaceHealth facilities in 2020, PeaceHealth deployed "the best tools available at the time" to balance care for COVID patients

---

[2] PeaceHealth refers to all employees as "caregivers."

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT AND DEFENDANT'S MOTION TO EXCLUDE PLAINTIFFS' EXPERT - 3

with the hospital's ability to care for other patients. Dkt. 72 ¶¶ 6, 7; Dkt. 73 ¶ 10; Dkt. 71 ¶ 5. These tools included screening, testing, masking, and other forms of personal protective equipment ("PPE"), as well as social distancing. Dkt. 72 ¶ 7; Dkt. 71 ¶ 5. Once COVID-19 vaccines became available in December 2020, PeaceHealth mobilized vaccine delivery within its communities and encouraged voluntary vaccination, including among its caregivers. Dkt. 72 ¶ 8; Dkt. 71 ¶ 6. The majority of PeaceHealth's caregivers were vaccinated in the weeks and months after the vaccines became available. Dkt. 71 ¶ 6; *see* Dkt. 72 at 22.

During the summer of 2021, the Delta variant of the COVID-19 virus became dominant in the U.S., spreading through PeaceHealth's service territories. Dkt. 69 ¶ 17; Dkt. 73 ¶ 18. Delta was not only more transmissible than prior variants but was also associated with a "significantly higher risk of severe disease and hospitalization." Dkt. 69 ¶ 17; *see also id.* ¶ 28 (COVID-19 cases "abruptly skyrocketed by 1200% during the Delta surge between June and September 2021, with hospital admissions up by a staggering 600% nationwide and, near the peak, a death toll of 1500 Americans daily").

Since the onset of the pandemic, PeaceHealth monitored internal census and epidemiological data, in addition to external research and guidance on COVID-19 statistics, forecasts, and vaccination data to inform its response. Dkt. 73 ¶ 11–12; *see* Dkt. 80 at 11–12. PeaceHealth data showed COVID-19 cases in the counties it served beginning to rise in mid-July 2021. Dkt. 73 at 69. By late July 2021, the number of counties experiencing a high presence of COVID-19 cases had increased significantly. *See id.* at 69–70; Dkt. 73 ¶ 22. Consistent with the rise of COVID-19 cases in the community, the total number of patients admitted to PeaceHealth's facilities for COVID-19 spiked in late July 2021. *See* Dkt. 73 at 72.

The operational impacts of the Delta surge on PeaceHealth were stark. PeaceHealth's facilities "were overflowing with patients." *Id.* ¶ 19. The Intensive Care Units ("ICUs") reached

capacity, requiring PeaceHealth to stop all elective surgeries and convert its surgical recovery areas into COVID-19 ICU areas. *Id.* PeaceHealth converted other extra space in its facilities to inpatient areas and doubled up single rooms. *Id.* ¶ 20. The number of deaths resulting from the Delta variant were so high in some service areas that the local morgues ran out of capacity, requiring PeaceHealth to create makeshift cooling bays within its hospitals to temporarily "hold deceased individuals from COVID-19." *Id.* ¶ 19.

The difficult conditions PeaceHealth faced in the summer of 2021 were underscored by predictions of continuing levels of high hospitalizations due to COVID-19. PeaceHealth "closely monitored forecasts" from the Oregon Health & Sciences University ("OHSU"), which published regular modeling of COVID-19 hospitalization rates in Oregon. Dkt. 73 ¶ 24. On July 23, 2021, the OHSU forecast predicted another wave of hospitalizations growing in August and into September and topping out at 330 COVID-positive hospitalizations in the state. *Id.*; *see id.* at 76. Alternative modeling that assumed a faster spreading variant and slower vaccination rates predicted hospitalizations could be three times as high, exceeding 1,000 COVID-positive hospitalizations. *Id.* ¶ 24; *see id.* at 77. Only one week later, OHSU updated its prior primary forecast to be "much more severe than previous forecasts," predicting an impending peak of more than 550 COVID-positive hospitalizations in the state, which would exceed all prior peaks. *Id.* ¶ 24; *see id.* at 81.

PeaceHealth data both before the emergence of the Delta variant and during the summer wave pointed to the differential impacts of COVID-19 on the unvaccinated. Based on PeaceHealth census data from late August 2021, most hospitalized patients were unvaccinated. *See* Dkt. 73 ¶ 16 (declaration stating that "approximately 80% of COVID-19 patients hospitalized in PeaceHealth were unvaccinated, 90% of COVID-19 patients in the ICU were unvaccinated, and over 90% of COVID-19 patients in the ICU on a ventilator were

unvaccinated"). PeaceHealth's internal data also pointed to the relative risk to patients posed by unvaccinated caregivers compared to vaccinated caregivers. *See generally* Dkt. 71.

From the start of the pandemic, PeaceHealth's Infection Prevention Team monitored the status of COVID-19 nationally, in Washington, and in all PeaceHealth facilities. *Id.* ¶ 7. As part of this work, the Infection Prevention Team investigated and tracked all patients with a "hospital-onset" COVID-19 infection, meaning patients who initially tested negative when they were admitted to the hospital and subsequently tested positive. *Id.* ¶ 10. Between January 1, 2021 and August 16, 2021, the Infection Prevention Team "identified 21 patients across PeaceHealth facilities who contracted COVID-19 from PeaceHealth caregivers[.]" *Id.* ¶ 14. The Infection Prevention Team then traced those patients back to their COVID-positive caregivers and found:

- The 17 vaccinated caregivers who tested positive for COVID-19 during the relevant timeframe potentially exposed 55 patients, but only one patient contracted COVID-19.

- The 19 unvaccinated caregivers who tested positive for COVID-19 during the relevant timeframe potentially exposed 96 patients, and 20 of those patients contracted COVID-19.

- No patients died from contracting COVID-19 from vaccinated caregivers.

- Two patients, both located at PeaceHealth's Ketchikan, Alaska, location, died after contracting COVID-19 from unvaccinated caregivers.

*Id.* ¶ 15. [3] Based on this data, PeaceHealth determined that patients were 7.1 times more likely to be exposed to COVID when cared for by an unvaccinated caregiver compared to a vaccinated caregiver. *Id.* at 17. The Infection Prevention Team also found that patients were 11.6 times

---

[3] Plaintiffs dispute the strength of the conclusions that should be drawn from this internal study, given, among other things, its small sample size. Dkt. 79 at 16–18. But Plaintiffs do not dispute the underlying data, nor do they dispute that this internal study was considered by PeaceHealth when it decided that allowing Plaintiffs to continue working in positions where they interacted with patients and other caregivers posed an undue hardship.

1    more likely to acquire the disease from exposure to an unvaccinated COVID-positive caregiver

2    than from exposure to a vaccinated COVID-positive caregiver. *Id.* at 19.

3    **B.      PeaceHealth's Ethical Discernment process.**

4           Based on the operational strain PeaceHealth's facilities were under by late July 2021,

5    forecasts warning of impending hospitalization peaks in its service territories, and internal data

6    pointing to heightened risks to patients from unvaccinated caregivers, PeaceHealth began a

7    process to determine whether it should require caregivers to be vaccinated. Dkt. 73 ¶ 26.

8    PeaceHealth implements a discernment process when it is "faced with an important, strategic

9    decision." *Id*. The discernment process follows a five-step framework to structure the team's

10   decision-making. *Id.*; Dkt. 73 at 84. The COVID-19 vaccination Ethical Discernment Team

11   included representatives from: PeaceHealth's Senior Leadership Team (SLT); leadership from

12   Human Resources; Mission, Theology, and Ethics; Legal; Clinical; Nursing; Employee Health;

13   and PeaceHealth's Board of Directors. Dkt. 73 ¶ 27.

14          PeaceHealth convened meetings with this Ethical Discernment Team on July 21 and July

15   27, 2021. *Id.* ¶¶ 28–29. The team "reviewed and discussed PeaceHealth's internal infection

16   prevention data, as well as publicly available information regarding COVID-19 and the

17   vaccines." *Id.* ¶ 28; *Id.* at 86. PeaceHealth's Chief Physician and Clinical Executive, Dr. Douglas

18   Koekkoek, "synthesize[d] the medical and scientific literature and recommendations from

19   regulatory and accrediting bodies[;] . . . commonly referenced publications in highly reputable,

20   peer-reviewed medical journals; . . . and epidemiologic and public health bodies[.]" Dkt. 73

21   ¶ 34; *see also* Dkt. 80 at 11 ("[T]he experts [we relied on] . . . are a variety of sources. So it was

22   documents from the CDC, and documents from our state and federal government, there were

23   some journal articles that were reviewed. There was data from our own infectious preventionists,

24

or epidemiologists, that we would consider sort of internal experts. So it was the totality of all those sources[.]").

The data from those sources showed that vaccines were safe, effective in reducing infections and hospitalizations, and especially valuable in congregate healthcare settings, even in the event of breakthrough infections among vaccinated staff. *See, e.g.*, Dkt. 73 at 93 (New England Journal of Medicine ("NEJM") study published June 30, 2021 finding that healthcare workers who were fully vaccinated reduced their risk of infection by 91% and, in the event of a breakthrough infection, "attenuated the viral RNA load, risk of febrile symptoms, and duration of illness"). Based on similar data, many healthcare-related organizations believed vaccine requirements for healthcare workers were necessary for patient safety. *See, e.g.*, Dkt. 71 at 12–13 (Consensus statement on July 13, 2021 by the Society for Healthcare Epidemiology of America and six other national organizations advocating for healthcare worker vaccine mandate). The same week PeaceHealth convened the second Ethical Discernment Team meeting, "over 40 hospital systems nationwide had announced vaccine requirement policies[.]" Dkt. 73 ¶ 31.

At the conclusion of the second session on July 27, the Ethical Discernment team voted unanimously to "require that all PeaceHealth Caregivers . . . have a Covid [v]accination, except as exempted by a religious or medical exception." *Id.* at 87.

## C. Announcement of Vaccine Requirement and third Ethical Discernment Process

On August 3, 2021, PeaceHealth sent out a systemwide email announcing that it would require all caregivers to receive full vaccination against COVID-19 in line with its new Vaccine Requirement Policy ("Vaccine Policy"). Dkt. 72 at 22–23; 17–20. The email stated that PeaceHealth "will be requiring caregivers to show proof of vaccination or submit a qualifying medical exemption on or before Aug. 31, 2021[.]" *Id.* at 22. It noted that if there was no record of vaccination by that date, "additional requirements (including masking, physical distancing,

reassignment to a non-patient care setting and regular COVID-19 testing) may apply[.]" The email also described why PeaceHealth was choosing to require vaccinations at that time:

> **New variants of COVID-19 are a public health emergency that pose a critical threat to those unable to be vaccinated, including children and the medically vulnerable.** Though nearly 80% of PeaceHealth caregivers have been vaccinated, the rise in hospitalizations and recent exposures in our facilities are a stark reminder that we must do more. It is our moral obligation to first do no harm and act for the common good. COVID-19 vaccines are proven to be the best way to protect ourselves and reduce the likelihood of harming others.

*Id.*

On the same day, PeaceHealth posted a list of frequently asked questions and answers ("FAQs"), which included preliminary information about religious exemptions. *Id.* ¶ 12; *see id.* at 28.

> Can caregivers submit a religious exemption?
> The new variants of COVID-19 are a public health emergency that pose a critical threat to those unable to be vaccinated. Very few religious denominations explicitly prohibit vaccinations, and we believe the common good is a moral imperative that requires those who are medically able to get a COVID-19 vaccine. If a caregiver has a religious objection to getting vaccinated, they should notify their supervisor. In consultation with Human Resources, such situations will be reviewed as to whether we need to and can reasonably accommodate a religious exemption on a case-by-case basis.

*Id.* at 28. PeaceHealth also provided guidance on requesting a medical exemption, which included submitting a qualifying medical exemption form with documentation to PeaceHealth's Employee Health Department. *Id.* at 26.

After the announcement and over the first half of August, PeaceHealth held virtual town halls to answer questions and receive feedback on the Vaccine Policy. Dkt. *Id.* ¶ 15. PeaceHealth also provided more guidance to caregivers seeking a religious exemption, including how to submit their religious objection to their supervisors. *Id.* ¶ 16. Then on August 16, 2021, PeaceHealth convened a third Ethical Discernment Team meeting to consider the impact of new data, guidance, and caregiver feedback on two questions: "(1) Will we require vaccinations?;

(2) Will we accommodate any non-vaccinated employees who mask and test?" Dkt. 80 at 60; Dkt. 73 ¶ 45.

Between the late July and mid-August meetings, more external data had surfaced on the severity of the Delta variant and the efficacy of vaccines in preventing its most severe effects. On July 30, 2021, a CDC article noted that between June 19 to July 23, 2021, "COVID-19 cases increased approximately 300% nationally, followed by increases in hospitalizations and deaths, driven by the highly transmissible" Delta variant. Dkt. 73 at 130. A New England Journal of Medicine article from August 2 estimated that through the end of June 2021, COVID-19 vaccines prevented 279,000 deaths and up to 1.25 million hospitalizations. *Id.* at 91. Another CDC article dated July 29, 2021 discussed the implications of the Delta strain on vaccine efficacy and breakthroughs among vaccinated individuals. Dkt. 73 at 104–28; Dkt. 78 at 17–39. The article acknowledged that vaccine breakthrough cases due to the Delta variant "may be as transmissible as unvaccinated cases." Dkt. 73 at 120; Dkt. 78 at 33. But while vaccines may be less effective at preventing infection or transmission, they still prevented ">90% of severe disease." Dkt. 73 at 125; Dkt. 78 at 38 *see also id.* at 34–35 (summarizing studies in England/Scotland, Canada, and Israel, with the latter study showing prevention of Delta variant infections reduced to 64%, but 93% effective in preventing hospitalizations or death). Reviewing national data through July 24, 2021, the CDC found that when compared to the unvaccinated, vaccinated individuals were eight times less likely to contract COVID-19 and 25 times less likely to be hospitalized or die from the virus. Dkt. 73 at 106; Dkt. 78 at 19.

PeaceHealth also reviewed updated internal data on COVID-19 hospitalizations and caregiver vaccination status. Dkt. 73 at 182; Dkt. 80 at 57. Based on its own census data, PeaceHealth facilities during the week of August 13, 2021 experienced the highest recorded week of COVID-19 hospitalizations up to that point. Dkt. 73 at 182. By August 9, 2021, internal

data also showed 12,909 of PeaceHealth's caregivers were fully vaccinated, out of 16,250 total employees. *Id.* at 183. In-progress survey results as of August 15, 2021, when the Ethical Discernment Team reviewed the data, showed that 15% of caregivers had submitted exemption requests. *Id.* at 184.

Less than one week after PeaceHealth's announcement of the Vaccine Policy, Washington state Governor Jay Inslee issued Proclamation 21-14 (with amendments, "the Proclamation"). Dkt. 73 ¶ 55; Dkt. 51 ¶ 97 n.20. The Proclamation prohibited any covered "Health Care Provider," which included PeaceHealth's caregivers, from failing to be fully vaccinated against COVID-19 after October 18, 2021. *Id.* The Proclamation allowed employers to provide religious accommodations unless doing so would cause undue hardship, consistent with the requirements of Title VII and the WLAD. Dkt. 51 ¶ 97 n.20.

In the third Ethical Discernment Team meeting, PeaceHealth reaffirmed its earlier decision to require all PeaceHealth caregivers to be vaccinated against COVID-19, unless exempted by a religious or medical exception. Dkt. 73 at 188; Dkt. 80 at 63. Resolving the second question, regarding what accommodations PeaceHealth would allow for unvaccinated caregivers, was more difficult. Dkt. 73 at 185; Dkt. 80 at 12. An excerpt from the August 16 Ethical Discernment agenda summarizes the considerations it was evaluating:

> Can we say we are unable to accommodate all non-vaccinated workers (i.e. we have no jobs that can be performed by non-vaccinated workers even if they mask and get tested)?
>
> We need to take the position (with supporting evidence from our experts) that allowing only vaccinated workers in some jobs (direct patient contact? vulnerable patient contact?) is clinically important. Then we need to determine if we are really saying (with professional clinical support) that NO jobs can be safely done by masked/tested unvaccinated workers, or can we say that they can safely perform certain jobs (non-direct patient care? Non-clinical? Remote?).

Dkt. 73 at 185.

At the meeting, a subset of PeaceHealth's Ethical Discernment Team made up of four medical clinicians, including Dr. Koekkoek, evaluated what accommodations could be made for unvaccinated caregivers based on their review of the internal and external data and guidance. Dkt. 80 at 13–14; Dkt. 73 ¶ 46. While multiple methods of protection against COVID-19 (such as PPE, testing, and social distancing) were important, they were already "baseline" requirements for PeaceHealth caregivers. Dkt. 73 ¶ 47. Each method was also regarded as limited in the context of a healthcare setting, whether because it did not provide continuous protection and was prone to human error (PPE); knowledge of positive cases often lagged how long the individual was contagious for and would be costly at scale (testing); or it was simply impractical in a congregate medical facility (distancing). *Id.* ¶¶ 47–50. PeaceHealth also considered that "people had some immunity after a natural course of infection . . . [b]ut how much protection that afforded with the changing variants was not clear." Dkt. 80 at 10. The drawbacks of these methods were evaluated against "[t]he current situation at [PeaceHealth] facilities and the information available at the time [that] those methods alone were no longer sufficient." Dkt. 73 ¶¶ 46–47, 50. In contrast, PeaceHealth regarded vaccination as "provid[ing] all the benefits—but none of the limitations—associated with other control measures[.]" *Id.* ¶ 50.

The Ethical Discernment Team decided that "allowing unvaccinated caregivers to continue working onsite after the Vaccination Policy went into effect (even with other precautions) would have subjected other caregivers and patients—including children, the elderly, and those who were medically fragile or vulnerable—to a higher risk of contracting COVID-19 . . . [and] heightened the risk of severe illness or death among PeaceHealth's patients." *Id.* ¶ 52. The operational impacts of more COVID-19 infections would also burden an already-strained system and affect PeaceHealth's ability to provide care to non-COVID patients. *Id.*; *see also* Dkt. 80 at 11 ("[A]fter discerning and trying to understand the pros and cons . . . the safest

1  way to protect our patients and our employees was to require vaccination for . . . employees that

2  had direct patient care[.]"). At the conclusion of the August 16 meeting, PeaceHealth determined

3  that unvaccinated caregivers would not be allowed in patient-facing roles or in roles where they

4  interacted with other caregivers. Dkt. 73 at 188. But if caregivers could perform their jobs

5  remotely, they could continue working with an approved medical or religious exemption. *Id.*

6  **D.    PeaceHealth's religious exemption and accommodations process**

7  On August 18, 2021, PeaceHealth emailed its leaders and revised its FAQs to reflect its

8  updated policy on accommodating unvaccinated caregivers with qualifying exemptions. Dkt. 72

9  at 33–47. PeaceHealth stated that after reviewing "[t]he latest data" on the "extreme

10  transmissibility of new COVID-19 variants," it made a "clinical determination that contact

11  between unvaccinated caregivers" and patients and other caregivers "pose[d] an unacceptable

12  health and safety risk." *Id.* at 33. The email outlined what this meant for the exemption and

13  accommodations process under way:

14  - **Unvaccinated caregivers <u>with</u> an approved exemption, *in any role*, will not be permitted to work in a PeaceHealth facility after Aug. 31, 2021.** You can work with HR to determine if the caregiver's role can be performed 100% remotely or if there is another accommodation that can be made, including a leave of absence. Accumulated PTO may be used for such leaves . . .

15  - **Unvaccinated caregivers <u>with</u> an approved exemption who work 100% remotely, and never enter a PeaceHealth facility, can continue to work remotely after Aug. 31, 2021.** No additional action is required.

16  - **Unvaccinated caregivers without an approved exemption will be placed on unpaid leave after Aug. 31, 2021.** PTO may not be used.

20  *Id.* at 33, 70.

21  PeaceHealth also clarified a limited exception for partially vaccinated caregivers. *Id.* at

22  56. Caregivers who had only received one dose of a two-dose vaccine by August 31, 2021 would

23  be permitted to continue in their current roles until October 15, 2021 to complete their

vaccination cycle. *Id.* In the interim six-week period, partially vaccinated caregivers would be subject to the previous baseline requirements of masking, physical distancing, and testing. *Id.*

After the initial announcement of the Vaccine Policy, PeaceHealth had established a Review Committee for religious exception requests. *Id.* ¶ 17. The Review Committee "analyzed each religious exception request to determine if getting vaccinated conflicted with the caregiver's sincerely held religious observance, belief, or practice or deeply held personal belief akin to a religious belief." *Id.* ¶ 20. Once the Committee approved or denied the request, the caregiver's HR partner and supervisor followed up to determine whether the caregiver could perform their position 100% remotely. *Id.; id.* at 73; Dkt. 74 at 111. PeaceHealth advised managers to focus on the following two questions for exempt caregivers:

**Question #1** - Is caregiver able to perform 100% of job remotely? Yes/No

**Question #2** - Does caregiver wish to use PTO? Yes/No

Dkt. 72 at 73; Dkt. 74 at 111. Caregivers that could not perform 100% of their position remotely received the only accommodation available: unpaid administrative leave. Dkt. 72 ¶¶ 21–22; *see, e.g.*, *id.* at 88.

Between the announcement of the Vaccine Policy and when the mandate went into effect on September 1, 2021, PeaceHealth's Human Resources team reported issues implementing the exemption and accommodations process, including "difficult confrontations" between caregivers and their managers. Dkt. 74 at 145. One Plaintiff, Leonid Kolbert, reported that her manager brought her into his office and said, "You can change your religion if you want to. You know, everybody does it." *Id.* at 129. PeaceHealth's HR team also described "complaints rolling in from a variety of fronts . . . related to some pretty extreme language, behavior and frustration with the [Vaccine] [P]olicy." *Id.* at 148. HR referenced additional reports from caregivers supportive of the Vaccine Policy "acting in a manner toward their unvaccinated peers in a way

that is outside of our value of respect." *Id.*; *see also id.* at 145 (HR email citing "[r]eports of very heated arguments between vaccinated and unvaccinated caregivers").

One Plaintiff, Joy Hoksbergen, described an incident she witnessed during August 2021 where one caregiver joked to others that "they (management) should just call it Jesus juice and make them (coworkers granted exemptions) take it." Dkt. 51-2 ¶ 10 (internal quotation marks omitted); Dkt. 74 at 136 (similar). Plaintiff Hoksbergen stated that she "immediately called house management to report the incident." Dkt. 51-2 ¶ 10. Another Plaintiff, Katherine Telford, described a separate incident where "[c]oworkers laughed as they pretended to be Christians praying to a rock on the side of the road imploring the rock to tell them what to do." Dkt. 74 at 136. During this period, PeaceHealth's communications team also reported that they were "seeing and hearing about more instances of caregivers making inappropriate comments on social media - some identify themselves as PH caregivers, others don't[.]" *Id.* at 17.

**E.    Plaintiffs' work responsibilities**

All 53 Plaintiffs worked for PeaceHealth in roles that required in-person contact with patients and/or other caregivers. *See generally* Dkt. 69 at 45–350. The level of interaction varied according to the type of position Plaintiffs held. *See id.*

Thirty-three of the 53 Plaintiffs worked as Registered Nurses ("RNs") or charge nurses based at a PeaceHealth facility at the time the Vaccine Policy went into effect. *See* Dkt. 51 ¶¶ 6, 7, 9, 11, 13, 14, 15, 17, 18, 21, 23, 26, 27, 28, 29, 35, 37, 38, 40, 41, 42, 43, 46, 47, 48, 50, 51, 52, 53, 54, 55, 56, 57. Nearly all acknowledged in their Requests for Admissions ("RFA") that their positions "required direct patient-facing care," that they "worked alongside other caregivers onsite[,]" and that their jobs could not be performed 100% remotely. *See, e.g.*, Dkt. 69 at 47–48, 71, 73, 79–81, 112, 114.

Two nurses, Plaintiffs Emily Humphreys and Rebecca Laughlin, denied that they could not perform their roles "without having direct and in person contact with co-workers and patients." *See id.* at 97–98; 122–23. Humphreys was a Float RN. Dkt. 51 ¶ 51. Although she stated that her "direct patient-facing care include[ed] working on the COVID ward [her] last day in full PPE," Dkt. 69 at 96, she also claimed that her manager "hired [her] to work remotely doing discharge phone calls which is in my job description," *id.* at 98. Laughlin worked as a Visiting Home Health RN. *Id.* at 120. She alleges that she had no in-person contact with other PeaceHealth caregivers beginning in early 2020 once her role "switched to working remotely from home." *Id.* at 120–21. Laughlin admits, however, that her job duties included "limited direct patient-facing care[.]" *Id.* at 122; *see also id.* at 123 ("The role did include a physical visit with the patients in the community.").

Although other Plaintiffs had less direct interactions with patients and other caregivers, all conceded that their work responsibilities required some in-person interactions. *See generally* Dkt. 69 at 45–350.

Plaintiffs George Allen, Leonid Kolbert, and Petr Ostapchuk worked as onsite engineers at PeaceHealth facilities. Dkt. 51 ¶¶ 16, 34, 44. Engineers' duties included "mak[ing] daily rounds in the areas of responsibility for maintenance" in PeaceHealth facilities. *See* Dkt. 69 at 325. Engineers would commonly see doctors, nurses, and patients' families in the hospital while they performed maintenance duties. *See id.* at 305–06. Although patient interactions were generally described as "seldom," *id.* at 265, Plaintiffs reported that certain interactions did occur in patients' rooms (e.g., when plugging a leak, fixing the toilet or the TV) and while riding the elevators, *see id.* at 263–69.

Plaintiffs Anastasia Yudin and James Zeller worked in pharmacy positions at PeaceHealth. Dkt. 51 ¶ 24 (pharmacy tech); ¶ 30 (pharmacist). Both explained that most of their

primary work responsibilities did not require interactions with patients or other caregivers. *See* Dkt. 69 at 339 (describing her job as "mostly in the [designated sterile environment] making compounds [and mixtures]"); *id.* at 344 ("[O]ur jobs required almost every minute at our computer station."). Still, both explained that in exigent circumstances, their roles required caregiver and/or patient interactions. *See id.* at 334 ("On rare occasions, if we had to run up a stat medication . . . we would have to track down the nurse and get a signature. And the nurse would then go into the patient room and deliver that medication, or we could find a pharmacist and the pharmacist would take care of that issue."); *id.* at 344–48 (describing their role responding to Code Strokes "one or two [times] per day" which included mixing drugs in the emergency room doctors' workspace and handing the prescription to the patient-facing nurse). Outside of their direct work responsibilities, pharmaceutical employees like Yudin and Zeller entered through the building where all PeaceHealth caregivers entered for work and used breakrooms located on the same floors as departments such as the ICU or surgery. *See id.* at 335–37.

Plaintiff Hydee Ward (née Coffman) was a Patient Access Representative ("PAR"). Dkt. 51 ¶ 19. Ward's position required her to be "physically present in the emergency room," including meeting ambulances as critical care patients arrived at the hospital during a Code Blue. Dkt. 69 at 276–79. More routinely, Ward's responsibilities included registering patients using a mobile cart taken into their rooms. *Id.* at 281.

Plaintiff Emma Doornbos was a Staffing Specialist. Dkt. 51 ¶ 20. Doornbos assigned float staff to units across the hospital, typically communicating their assignments in-person when they approached her desk. Dkt. 69 at 296–97. Doorbos assigned patient-facing RNs and Certified Nursing Assistants ("CNAs") to various departments, including the emergency department. *Id.* at 297–99. Like other Plaintiffs, Doornbos also used shared breakrooms with other caregivers. *See id.* at 294.

Despite their differing job responsibilities, all Plaintiffs—except for Humphreys and Laughlin, as noted above—conceded that they could not have performed their existing roles 100% remotely. *See generally id.* at 45–350.

**F.    Plaintiffs request religious exemptions**

Nearly all[4] Plaintiffs submitted religious exception requests. Dkt. 72 ¶ 26; *see* Dkt. 51 ¶¶ 6–59. PeaceHealth determined that none of the Plaintiffs could perform their positions remotely. *Id.* Accordingly, each of the Plaintiffs received a notice that the only accommodation available was an unpaid leave of absence. *See* Dkt. 72 at 88; *id.* ¶ 26.

PeaceHealth was also unable to accommodate Plaintiffs through reassignment to any of its available remote positions. Dkt. 72 ¶ 26.[5] It acknowledged that "due to the nature of healthcare, most caregiver roles cannot be performed fully remotely, so from a practical standpoint, it was not possible for most caregivers with approved religious exceptions to continue doing their jobs away from a PeaceHealth facility." *Id.* ¶ 21. PeaceHealth also determined that "[c]reating new remote positions" for the number of exempt, unvaccinated caregivers was infeasible. *Id.* The parties dispute the number of medical and religious exemptions that PeaceHealth received, approved, and was required to reasonably accommodate unless doing so posed an undue hardship. *Id.*; Dkt. 79 at 14–16; Dkt. 85 ¶¶ 12–13; Dkt. 88 ¶ 4. Viewing the evidence in the light most favorable to Plaintiffs, data that Plaintiffs point to still

---

[4] Plaintiff Maria O'Neill requested a medical exception, which was approved. Dkt. 72 ¶ 26 n.1; *see* Dkt. 51 ¶ 33. PeaceHealth would also be entitled to summary judgment on O'Neill's claims because Plaintiffs have not submitted any evidence (or argument) that PeaceHealth violated the law by failing to reasonably accommodate O'Neill's medical exception.

[5] Plaintiff Emily Humphreys was offered and worked in a temporary, part-time position at PeaceHealth following implementation of the Vaccine Policy, "doing discharge phone calls" from January to May 2022. Dkt. 74 at 169; *see* Dkt. 85 ¶ 5.

shows that by September 23, 2021, PeaceHealth had approved exemptions for 530 caregivers.[6]
*See* Dkt. 80 at 49–50.

**G.    PeaceHealth updates Plaintiffs on accommodations through April 2023 until policy changes.**

After September 2021, PeaceHealth "periodically evaluated changing conditions related to the pandemic and whether other reasonable accommodations were available that did not create an unreasonable health and safety risk to patients and caregivers." Dkt. 73 ¶ 58. Until April 2023, PeaceHealth "continued to determine that it still would pose an unreasonable exposure risk to patients and staff to allow unvaccinated caregivers to return to work in person." *Id.*

PeaceHealth sent email updates "every few months," Dkt. 72 ¶ 23, that it was "able to continue to accommodate [Plaintiff] with an administrative leave of absence until [Plaintiff] receive[s] the vaccination or [is] called back to work." *See* Dkt. 72 at 90–92 (emails sent to one Plaintiff on March 25, 2022, June 23, 2022, and February 27, 2023).

PeaceHealth's decision was based in part on the emergence of a new COVID-19 variant, Omicron, even as COVID-19 hospitalizations were declining from the Delta surge in early 2022. Dkt. 73 ¶ 59. PeaceHealth determined that it was "too early to say what its long-term effect would be on hospitalizations and death." *Id.* ¶¶ 59–60. PeaceHealth also considered that, at the time,

---

[6] Plaintiffs argue that "PeaceHealth's numbers are not consistent as the number of unvaccinated but compliant caregivers was reported as 530 on September 23, 2021, as opposed to the 567" noted in an email on September 19, 2021. Dkt. 79 at 15. PeaceHealth's System Director of People Operations explains that the changing number of exemptions reflected an "evolving situation." Dkt. 88 ¶ 4 ("That the number of caregivers on administrative leave fluctuated is unsurprising, given that some caregivers' exception requests were denied, others opted out to get vaccinated notwithstanding approval of their exception request, and others left PeaceHealth."). Elsewhere in Plaintiffs' briefing, they contend that PeaceHealth's data shows that "only two percent of the workforce," or roughly 325 employees, received exemptions. Dkt. 65 at 34–35. But the data Plaintiffs cite to refers only to exemptions received by September 2021 in PeaceHealth's Northwest network, one of three networks in the PeaceHealth system. *See* Dkt. 73 at 184.

1    vaccine mandates at the state and federal level were still in effect. *Id.* ¶ 59. On October 31, 2022,

2    Governor Inslee ended Washington's Emergency Proclamation. Dkt. 74 at 285–86. The federal

3    vaccine mandate—promulgated by the Centers for Medicare & Medicaid Services of the

4    Department of Health and Human Services ("CMS") for employees of Medicare and Medicaid

5    service providers—remained in effect until June 5, 2023. *See* Dkt. 73 ¶ 59; Dkt. 68 at 17.

6        In April 2023, PeaceHealth updated its Vaccine Policy to allow exempt unvaccinated

7    workers to return to work in its facilities if they used an N95/KN95 mask at all times. Dkt. 73

8    ¶ 61; Dkt. 80 at 158. Emails sent to exempt caregivers on April 12, 2023 explained that the

9    Policy update resulted from "PeaceHealth's clinical leadership, in collaboration with Infection

10   Prevention . . . recently complet[ing] a careful review of scientific evidence and regulatory

11   requirements." *See, e.g.*, Dkt. 80 at 158. PeaceHealth asked caregivers to respond to the email to

12   indicate if they wished to return to work or if they did not intend to return, in which case

13   PeaceHealth would process their termination. *Id.*

14   **H.    Procedural history**

15       Plaintiffs filed this action on December 12, 2022, asserting federal and state claims

16   against Defendant PeaceHealth and eight PeaceHealth employees. Dkt. 1. Defendants moved to

17   dismiss all claims under Federal Rule of Civil Procedure 12(b)(6). Dkt. 17. Plaintiffs filed a

18   response along with an amended complaint. Dkt. 26, 29. In the amended complaint, Plaintiffs

19   added new plaintiffs, factual allegations, and claims for relief for disparate treatment, disparate

20   impact, and hostile work environment, each under Title VII of the Civil Rights Act of 1964

21   ("Title VII") and the Washington Law Against Discrimination ("the WLAD"). *See generally*

22   Dkt. 29. On November 9, 2023, this Court granted in part and denied in part the motion to

23   dismiss. Dkt. 43. The Court dismissed with prejudice Plaintiffs' Wage Theft, Arbitrary and

24   Capricious Government Action, and Declaratory Relief claims; Plaintiffs' claim for Injunctive

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT AND DEFENDANT'S MOTION TO
EXCLUDE PLAINTIFFS' EXPERT - 20

1  Relief to the extent Plaintiffs sought to enjoin the vaccination policy; and all individually-named

2  defendants, leaving PeaceHealth as the only defendant. *Id.* at 28.

3          For all but one plaintiff, the Court denied Defendants' motion to dismiss Plaintiffs'

4  Failure to Accommodate and Unlawful Employment Discrimination claims. *Id.* at 28. The Court

5  also denied Defendants' motion to dismiss Plaintiffs' claim for injunctive relief related to

6  individual reasonable accommodation claims. *Id.* Finally, the Court declined to rule on Plaintiffs'

7  new claims for disparate treatment, disparate impact, and hostile work environment without

8  allowing PeaceHealth an opportunity to file a responsive pleading or new motion. *Id.* at 20–21;

9  25, 28.

10          Plaintiffs moved to amend their complaint a second time to add four plaintiffs to the

11  remaining live claims, Dkt. 49, which this Court granted, Dkt. 51. PeaceHealth filed an answer,

12  including denying Plaintiffs' disparate treatment, disparate impact, and hostile work environment

13  claims. Dkt. 52 at 27–28; 29–30.

14          On April 11, 2025, Plaintiffs moved for summary judgment on their Title VII and WLAD

15  discrimination claims. Dkt. 65. The same day, PeaceHealth cross-moved for summary judgment

16  on all remaining claims. Dkt. 68. PeaceHealth also moved to exclude Plaintiffs' expert

17  Dr. Harvey Risch under Federal Rule of Evidence 702. Dkt. 66. In its response to Plaintiffs'

18  Motion for Partial Summary Judgment, PeaceHealth also asks the Court to strike large portions

19  of Plaintiff's evidence as inadmissible. Dkt. 82 at 5, 24–29; *see* Dkt. 84 (chart summarizing

20  PeaceHealth's objections to Plaintiff's "Proffered 'Evidence'"). The Court heard oral argument

21  on August 18, 2025. Dkt. 100. The motions are fully briefed and ripe for the Court's

22  consideration.

23

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

### III.    SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where, as here, "the parties file cross-motions for summary judgment, the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011) (citing *Fair Hous. Council v. Riverside Two,* 249 F.3d 1132, 1136 (9th Cir. 2001)). And "[w]here the moving party has the burden of proof at trial (such as a defendant seeking summary judgment based on an affirmative defense) he must demonstrate that no reasonable trier of fact could find against him." *Intelligent Peripheral Devices, Inc. v. SmartPad, Inc.*, No. C95-4479-FMS, 1998 WL 754606, at *2 (N.D. Cal. Oct. 26, 1998) (citing *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)); *see also Clark v. Capital Credit & Collection Servs.*, 460 F.3d 1162, 1177 (9th Cir. 2006) (recognizing that a defendant bears the burden of proof at summary judgment with respect to an affirmative defense). A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The evidence relied upon at summary judgment must be able to be "presented in a form that would be admissible in evidence." *See* Fed. R. Civ. P. 56(c)(2). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the

witness's own testimony.").

Conclusory, nonspecific statements in affidavits are not sufficient, and "missing facts" will not be "presume[d]." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990). However, "'[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam) (quoting *Anderson*, 477 U.S. at 255). Consequently, "a District Court must resolve any factual issues of controversy in favor of the non-moving party only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied." *Lujan,* 497 U.S. at 888 (internal quotations omitted).

## IV.    DISCUSSION

### A.    PeaceHealth's objections to Plaintiffs' proffered evidence

Before proceeding with the substantive claims, the Court first addresses PeaceHealth's evidentiary arguments raised in its response to Plaintiffs' Motion for Partial Summary Judgment. Dkt. 82 at 5, 24–29; Dkt. 84. PeaceHealth contends that most of Plaintiffs' material evidence is inadmissible. *See generally id.*

The evidence relied on by either party at the summary judgment stage must be capable of presentation at trial "in a form that would be admissible in evidence." *See* Fed. R. Civ. P. 56(c)(2); *Harlow v. Chaffey Cmty. Coll. Dist.*, No. 21-55349, 2022 WL 4077103, at *1 (9th Cir. Sept. 6, 2022) (same). The Court does "not focus on the admissibility of the evidence's form" as it is presented in the summary judgment record. *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 666 (9th Cir. 2021) (quoting *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003)). Rather, courts "focus on the admissibility of its contents." *Id.* (quoting *Fraser*, 342 F.3d at 1036). If the contents of a document could be "presented in a form that would be admissible at trial . . . the mere fact that the document itself might be excludable hearsay provides no basis for refusing to

1    consider it" at this stage. *Id.* (citing *Fraser*, 342 F.3d at 1036); *see also City of Lincoln v. County*

2    *of Placer*, 668 F. Supp. 3d 1079, 1087 (E.D. Cal. 2023) (explaining that objections based on

3    hearsay, foundation, and authenticity are often overruled at summary judgment if "the substance

4    could conceivably be made admissible at trial") (citation omitted).

5        PeaceHealth makes six objections to the evidence Plaintiffs offer in support of their

6    Motion. Dkt. 82 at 24–29. Four of PeaceHealth's recurring objections to Plaintiffs' evidence—

7    foundation, authentication, personal knowledge, and hearsay—are generally premature because

8    they improperly "focus on the admissibility of the evidence's form" as presented at summary

9    judgment. *See Sandoval*, 985 F.3d at 666. The Court agrees with PeaceHealth, however, that

10   Plaintiffs often assert facts in their briefing without citation to evidence in the record. *See, e.g.*,

11   Dkt. 65 at 34 ("It is undisputable that at least some of those employees would have had post-

12   infection immunity including some Plaintiffs."). Even so, "[t]he Court declines to individually

13   address each statement [PeaceHealth] seeks to strike but has considered only admissible

14   evidence in reaching its decision." *Petersen v. Snohomish Reg'l Fire & Rescue*, No. C22-1674

15   TSZ, 2024 WL 278973, at *5 (W.D. Wash. Jan. 25, 2024).

16   **B.    Failure to accommodate under Title VII and the WLAD**

17       The parties cross-move for summary judgment on Plaintiffs' claim that PeaceHealth

18   failed to accommodate their religious beliefs in violation of 42 U.S.C. §§ 2000e–2(a)(1), and the

19   WLAD, RCW 49.60. Dkt. 65 at 6; Dkt. 68 at 5; Dkt. 51 ¶¶ 160–66; 176–83.

20       Under Title VII, it is unlawful for an employer to "fail or refuse to hire or to discharge

21   any individual, or otherwise to discriminate against any individual with respect to his

22   compensation, terms, conditions, or privileges of employment, because of" that individual's

23   religion. 42 U.S.C. § 2000e-2(a)(1). An employer must "reasonably accommodate" an

24   employee's religious practice unless such accommodation would impose "undue hardship on the

conduct of the employer's business." *Id.* § 2000e(j). Similarly, under the WLAD, employers may not refuse to hire, discharge, bar from employment, or discriminate against in compensation or other terms of employment any person because of their religion. RCW § 49.60.180; *see Kumar v. Gate Gourmet, Inc.*, 180 Wn. 2d 481, 500–01, 325 P.3d 193 (2014). The WLAD also creates a cause of action for failure to reasonably accommodate an employee's religious practices. *Kumar*, 180 Wn. 2d at 500–01. To sustain a WLAD failure-to-accommodate claim, Plaintiffs must put forward evidence supporting substantially the same elements as a Title VII failure-to-accommodate claim. *See id.* at 501–02. Accordingly, the Court considers the state and federal claims together.

To prove a Title VII failure-to-accommodate claim, a plaintiff "must first set forth a prima facie case that (1) he had a bona fide religious belief, the practice of which conflicts with an employment duty; (2) he informed his employer of the belief and conflict; and (3) the employer discharged, threatened, or otherwise subjected him to an adverse employment action because of his inability to fulfill the job requirement." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 606 (9th Cir. 2004) (citing *Heller v. EBB Auto. Co.,* 8 F.3d 1433, 1438 (9th Cir. 1993)). "Once an employee establishes a prima facie case of failure to accommodate religion, the burden shifts to the employer to show 'either that it initiated good faith efforts to accommodate reasonably the employee's religious practices or that it could not reasonably accommodate the employee without undue hardship.'" *Bolden-Hardge v. Off. of Cal. State Controller*, 63 F.4th 1215, 1224 (9th Cir. 2023) (quoting *Tiano v. Dillard Dep't Stores, Inc.*, 139 F.3d 679, 681 (9th Cir. 1998)). The "undue hardship" defense is a complete defense to Title VII and WLAD failure-to-accommodate claims. *See* 42 U.S.C. § 2000e(j); *Kumar*, 180 Wn.2d at 501–02.

1

2

      1.     *Plaintiffs have put forward sufficient evidence to support a prima facie case of failure to accommodate religion.*

3

Plaintiffs have met their prima facie burden for their failure-to-accommodate religion

4

claim. PeaceHealth concedes that "[w]ith the exception of Plaintiff Maria O'Neill, [it] received

5

requests for religious exceptions to the Vaccination Policy from each of the Plaintiffs[.]" Dkt. 72

6

¶ 26; Dkt. 68 at 17 ("Every Plaintiff except one requested, and received, a religious exception to

7

the Vaccination Policy."). PeaceHealth admits that it approved all of Plaintiffs' exception

8

requests, including Plaintiff O'Neill's medical exception. Dkt. 72 ¶ 26; Dkt. 52 ¶¶ 6–59; Dkt. 68

9

at 17. Thus, PeaceHealth does not dispute that 52 of the 53 Plaintiffs had a bona fide religious

10

belief that conflicted with their employment, and that Plaintiffs informed PeaceHealth of their

11

beliefs and the conflict. *See Peterson*, 358 F.3d at 606; Dkt. 65 at 17–18; Dkt. 68 at 17. At oral

12

argument, PeaceHealth also conceded that the accommodation it offered Plaintiffs—unpaid

13

administrative leave—was an "adverse employment action." *See* Dkt. 100; *see also* Dkt. 68 at

14

17–18; *Peterson*, 358 F.3d at 606. Plaintiffs have therefore established a prima facie case of

failure to accommodate religion. *See Peterson*, 358 F.3d at 606.

15

16

      2.     *Defendants have established that accommodating Plaintiffs would have been an undue hardship as a matter of law.*

17

PeaceHealth argues that Plaintiffs cannot sustain their failure-to-accommodate claim

18

because there is no dispute of material fact that allowing unvaccinated caregivers, including

19

Plaintiffs, to continue working onsite presented an undue hardship to PeaceHealth. Dkt. 68 at

20

24–25; Dkt. 82 at 8–10. The Court agrees.

21

An employer is not required to reasonably accommodate an employee's religious practice

22

if doing so would impose "undue hardship on the conduct of the employer's business." 42 U.S.C.

23

§ 2000e(j). To establish that a particular accommodation would impose undue hardship, "an

24

employer must show that the burden of granting an accommodation would result in substantial

increased costs in relation to the conduct of its particular business." *Groff v. DeJoy*, 600 U.S. 447, 470 (2023) (citation omitted). "What constitutes undue hardship must be determined within the particular factual context of each case." *Balint v. Carson City, Nev.*, 180 F.3d 1047, 1054 (9th Cir. 1999) (citation omitted); *see also Groff*, 600 U.S. at 473 (describing undue hardship as a "context-specific standard"). When an employer determines a particular accommodation request would cause undue hardship, the employer must consider alternative accommodation options. *Groff*, 600 U.S. at 473. Courts must "take[] into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of [an] employer." *Id.* at 470–71 (citation modified).

Consistent with this guidance, "analysis of an 'undue hardship' defense is not simply a financial or monetary loss calculation," but also encompasses non-monetary considerations. *Suarez v. State*, 3 Wn.3d 404, 427, 552 P.3d 786, 799 (2024); *Bordeaux v. Lions Gate Ent., Inc.*, 703 F. Supp. 3d 1117, 1134 (C.D. Cal. 2023), *aff'd*, No. 23-4340, 2025 WL 655065 (9th Cir. Feb. 28, 2025) ("Non-economic impacts on coworkers can be considered, so long as those impacts are not the result of employee animosity to a particular religion, to religion in general, or the notion of accommodating religious practice.") (citing *Groff*, 600 U.S. at 472). "Costs" encompass an "accommodation's effect on co-workers" which "may have ramifications for the conduct of the employer's business." *Groff*, 600 U.S. at 472. Courts' consideration of economic and non-economic costs also includes health and safety risks. *Efimoff v. Port of Seattle*, No. 2:23-CV-01307-BAT, 2024 WL 4765161, at *8 (W.D. Wash. Nov. 13, 2024) (citing *Suarez*, 552 P.3d at 798–99); *Lavelle-Hayden v. Legacy Health*, 744 F. Supp. 3d 1135, 1151 (D. Or. 2024) ("Consistent with the pre- and post-*Groff* authority . . . it is appropriate to consider not only calculable economic costs but also non-economic costs, like the cost to an employer's mission and potential safety risks, in analyzing undue hardship.").

1       The Ninth Circuit and many district courts have also recognized that the spread of

2  COVID-19 created valid health and safety concerns that can constitute an undue hardship. *See,*

3  *e.g.*, *Bordeaux*, 703 F. Supp. 3d at 1136 ("Numerous courts have found the possibility of an

4  unvaccinated individual getting others sick to be a non-speculative risk that a court may consider

5  when performing an undue hardship analysis") (citing cases); *Doe v. San Diego Unified Sch.*

6  *District*, 19 F.4th 1173, 1180 (9th Cir. 2021) (citing EEOC guidance that an employee's religious

7  exemption from an employer's vaccine mandate can be denied on the ground that it unduly

8  burdens the employer's business by "increasing 'the risk of the spread of COVID-19 to other

9  employees or to the public.'"). Finally, "[c]ourts within the Ninth Circuit recognize that 'it is

10 appropriate to confine the [undue hardship] analysis to the information available to the employer

11 when it made its undue hardship decision.'" *Efimoff*, 2024 WL 4765161, at *9 (collecting cases).

12      PeaceHealth has met its burden to show that the potential accommodations available—

13 allowing Plaintiffs to continue working onsite or reassigning them to other positions—would

14 have caused an undue hardship. PeaceHealth argues that allowing unvaccinated caregivers to

15 work in person "significantly increased health and safety risks to its patients and caregivers,

16 regardless of whether other (alone insufficient) measures were taken." Dkt. 92 at 4. These other

17 measures—PPE, testing, and social distancing—are the same precautions Plaintiffs assert could

18 have been used to accommodate their religious beliefs and allow them to work while

19 unvaccinated. Dkt. 79 at 28, 31; *see, e.g.*, Dkt. 51 ¶ 7 ("[A]ccommodation request included

20 wearing the N-95 mask, face shield, gloves, and isolation gown as she had been doing

21 throughout the pandemic."); *id.* ¶ 46 ("She used masks and PAPRs, maintained sufficient

22 handwashing, and practiced social distancing . . . . Her accommodation request included those

23 methods that had worked for over a year and half."); *id.* ¶ 12 ("Her reasonable accommodation

24 request included the precautions she had successfully used for the previous year and a half to

include testing as needed."). Plaintiffs alternatively argue that they could have been accommodated through remote positions that would have allowed them to continue to work. Dkt. 79 at 14–16; *see, e.g.*, Dkt. 52 ¶¶ 35, 44; Dkt. 51-2 ¶ 9.

First, PeaceHealth produced uncontroverted evidence that between mid-July and mid-August 2021—when PeaceHealth considered and began implementing the Vaccine Policy—it saw an alarming surge of COVID-19 cases across its service territories. *See* Dkt. 73 at 69–70; *Id.* ¶ 22. Unsurprisingly, the rise of COVID-19 within its communities soon arrived at its facilities, resulting in PeaceHealth contending with an unprecedented peak of COVID-induced hospitalizations. *See, e.g.*, *id.* at 182. As a result, PeaceHealth's facilities strained under the mounting pressure of hospitalizations and deaths from the Delta variant. *Id.* ¶¶ 19–20. The burden caused by the Delta variant also required PeaceHealth to transform its operations and limit care for non-COVID patients, which included stopping all elective surgeries. *Id.* Further, forecasts showed that in its surrounding service areas, the Delta wave would continue to bring higher COVID hospitalization rates than PeaceHealth had experienced at any other point in the pandemic. *Id.* at 76–77, 81–82.

Second, PeaceHealth produced unopposed evidence that previously deployed tools—such as PPE, testing, and social distancing—were insufficient measures on their own to manage the heightened risk of transmission, and especially hospitalizations and death, at PeaceHealth facilities. In support of this argument, PeaceHealth cites the expert opinion of Dr. Cohen, a Clinical Associate Professor in the Division of Allergy and Infectious Diseases at the University of Washington and the Medical Director of Infection Prevention at the University of Washington Medical Center. Dkt. 69 ¶ 4; *id.* at 14–26; 33–43.[7] Cohen acknowledged that while these

---

[7] Plaintiffs have not challenged the admissibility of Dr. Cohen's opinions.

measures were "all highly effective, they were not a substitute for vaccination in [a] healthcare [setting]." *Id.* at 25. Although masks can "help prevent acquisition of infection," it is "impossible to wear PPE constantly, without interruption." *Id.* at 26. Cohen points to the risks posed by other caregivers from poor PPE adherence, regardless of whether their job responsibilities involved extensive patient and caregiver contact. *See id.* Based on his own clinical experience contact tracing in healthcare facilities, "many cases of COVID-19 acquired in healthcare settings occurred in break rooms (where healthcare workers had already doffed their PPE)[.]" *Id.* And while social distancing is "complementary to decreasing spread of infection," Cohen argues that "healthcare is by nature a team endeavor and it is impossible to socially distance at all times while working on site in healthcare." *Id.*

Finally, Cohen points to research that symptom-based and/or regular testing is not a sufficient replacement for vaccination because unvaccinated individuals may not test positive until several days into their infection, unknowingly contributing to outbreaks. *Id.* at 25. Cohen also notes that testing has drawbacks, including delays in receiving results and false positives. *Id.* Cohen's testimony supports PeaceHealth's internal analysis of the limitations of non-vaccine interventions, especially within the context of the growing rate of infections and hospitalizations it faced. *See* Dkt. 73 ¶ 47 (Koekkoek describing PPE, testing, social distancing, restrictions on visitation, and additional hand hygiene protocols as "already the 'baseline' requirements" for caregivers when the hospital system confronted the Delta surge); *see also Groff*, 600 U.S. at 473 (describing undue hardship as a "context-specific standard").

Third, PeaceHealth produced uncontroverted evidence that vaccinated caregivers had a markedly lower risk of contracting COVID-19 compared to unvaccinated caregivers, resulting in at least a reduced opportunity of transmitting the virus to others as well as a significantly reduced risk of suffering severe outcomes. *See, e.g.*, Dkt. 73 at 93 (NEJM study finding that healthcare

workers who were fully vaccinated reduced their risk of infection by 91% and, in the event of a breakthrough infection, "attenuated the viral RNA load, risk of febrile symptoms, and duration of illness"); Dkt. 78 at 19 (CDC article reviewing national data through July 24, 2021 that vaccinated individuals were eight times less likely to contract COVID-19 and 25 times less likely to be hospitalized or die from the virus); Dkt. 69 ¶ 23 (Cohen explaining that high vaccination rates help reduce overall transmission risk "because people who are vaccinated are less likely to become infected in the first place"); *see also Zimmerman v. PeaceHealth*, 701 F. Supp. 3d 1099, 1114 (W.D. Wash. 2023) ("Defendants' arguments persuasively demonstrate that . . . the scientific consensus at the time PeaceHealth enacted its mandate showed that vaccination of healthcare workers (and increasing vaccination rates through mandates) improved patient safety.").

Even when the Court accepts as true that vaccine efficacy waned with the emergence of the Delta variant, *see* Dkt. 79 at 21–22, the many benefits of vaccination in a healthcare setting remain uncontradicted. *See, e.g.*, Dkt. 78 at 35 (one study showing vaccine prevention against Delta variant infections reduced to 64%, but still 93% effective in preventing hospitalizations or death). And while Plaintiffs dispute the significance of PeaceHealth's internal analysis of COVID-onset hospitalizations in its facilities, *see supra* Sec. II.A, there is no issue of material fact that PeaceHealth's own data corroborated national statistics on the increased risks associated with unvaccinated individuals in healthcare settings. *See also* Dkt. 73 ¶ 16 (declaration stating that "approximately 80% of COVID-19 patients hospitalized in PeaceHealth were unvaccinated, 90% of COVID-19 patients in the ICU were unvaccinated, and over 90% of COVID-19 patients in the ICU on a ventilator were unvaccinated").

Fourth, PeaceHealth produced unopposed evidence that all Plaintiffs' job responsibilities included working with or alongside patients and/or other caregivers. *See generally* Dkt. 69 at 45–

350. PeaceHealth similarly produced evidence that Plaintiffs' job responsibilities could not be performed 100% remotely. *See generally id.* Although the parties dispute the exact number of unvaccinated exempt caregivers seeking accommodations, *see supra* Sec.II.F, Plaintiffs do not contest PeaceHealth's assessment that "due to the nature of healthcare, most caregiver roles cannot be performed fully remotely[.]" Dkt. 72 ¶ 21; *cf.* Dkt. 85 ¶ 5 ("Because of their work in IT, PeaceHealth concluded that many TSP [Technology Solutions Partners] caregivers could perform their positions 100% remotely and, during the period the Vaccination Policy was in effect, would not be required to work onsite."). So, while PeaceHealth considered and granted some accommodations for exempt caregivers who could perform their jobs offsite, *see* Dkt. 85 ¶¶ 4–5, the "practical impact" of creating several hundred new remote positions "in light of the nature, size and operating cost" of PeaceHealth's hospital system was infeasible. *Groff*, 600 U.S at 470–71 (citation modified); *see, e.g.*, *Lavelle-Hayden*, 744 F. Supp. 3d at 1153 (D. Or. 2024) ("[W]here, as here, multiple plaintiffs all had direct, in-person contact with patients and coworkers and requested the same accommodation, it is appropriate to consider the aggregate effect of the requested accommodation as part of *Groff*'s totality-of-the-circumstances test."); *Williams v. Legacy Health*, No. 3:22-CV-06004-TMC, 2024 WL 3993162, at *7 (W.D. Wash. Aug. 29, 2024) (concluding that "[a]ccommodating hundreds of [healthcare] employees refusing vaccination" posed "substantial costs" "to its business of providing healthcare and upholding the health of its patients and staff.") (citation modified).

In sum, PeaceHealth has produced overwhelming evidence that accommodating Plaintiffs—by allowing them to continue working at PeaceHealth's facilities while unvaccinated—would have imposed "substantial increased costs" to its business, resulting in an undue hardship. *See Groff*, 600 U.S. at 473. Plaintiffs do not dispute that PeaceHealth's "business" as a hospital system is to protect the health and safety of its patients as well as the

staff that cares for them. *See* Dkt. 72 at 13, 15. PeaceHealth's ability to accomplish that mission—already burdened by an 18-month pandemic—was further compromised by the Delta wave, which resulted in soaring COVID-19 cases in the community and an unprecedented peak of hospitalizations that required substantial changes to its operations. Dkt. 73 at 69–70, 72; *id.* ¶¶ 19–20. Based on the internal data and external guidance available to it at that time, PeaceHealth also knew that vaccines were safe and effective in reducing infections, severe illness, and death. *See, e.g.*, Dkt. 78 at 19. These protections were especially valuable in acute care settings because of healthcare workers' increased exposure to COVID-19, interactions with medically vulnerable patients, and the limitations of all other non-vaccination control measures. Dkt. 69 ¶¶ 27, 34–38. And despite the differences in roles Plaintiffs held, each Plaintiff's work responsibilities required interaction with patients— including children, the elderly, and those who were medically fragile or vulnerable—or other caregivers in PeaceHealth facilities whose own roles required such patient-facing care. *See supra* Sec. II.F.

Within this context, courts in the Ninth Circuit have consistently held that "allowing certain staff members with increased risk of carrying and spreading COVID-19 to continue close interaction with patients and staff would have 'substantial' 'ramifications' on its business of providing healthcare." *Williams*, 2024 WL 3993162, at *6 (first citing *Groff*, 600 U.S at 470–72; and then citing *Balint*, 180 F.3d at 1053–54); *see also Bordeaux v. Lions Gate Ent., Inc.*, No. 23-4340, 2025 WL 655065, at *2 (9th Cir. Feb. 28, 2025) (holding that an "employer need not establish that an adverse health or safety event is *certain* to result from an accommodation to establish undue hardship," and that the "prevalence of COVID-19 in [the area] over the relevant time period [and] the risk of [plaintiff] coming into 'close contact' with an individual testing positive was a real, not a hypothetical, risk") (emphasis in original) (citation modified); *Lavelle-Hayden*, 744 F. Supp. 3d at 1158 (granting defendant hospital network summary judgment after

it produced internal and external evidence that Delta's influx of cases and hospitalizations was burdening an already-taxed healthcare system; non-vaccine interventions were not remedying the growing health and safety concerns; and vaccines were the "best tool available to reduce the likelihood of infection and transmissibility, along with severe illness and death"). PeaceHealth has therefore established that any accommodation, other than the administrative leave it provided Plaintiffs, would have resulted in an undue hardship.

> 3.    *Plaintiffs fail to rebut PeaceHealth's evidence of undue hardship.*

Plaintiffs fail to raise a dispute of fact that PeaceHealth's decision not to allow unvaccinated caregivers to work onsite would not have resulted in "substantial increased costs" to its hospital system. *See Groff*, 600 U.S. at 470. Plaintiffs do not dispute that vaccination reduced the risk of COVID-19-related infections, hospitalizations, and deaths. *See* Dkt. 65 at 34–35; Dkt. 79 at 6–13, 20–23. Nor do Plaintiffs argue that any non-vaccine interventions requested by Plaintiffs as reasonable accommodations were comparable tools in reducing the risk of COVID-19-related infections, hospitalizations, and deaths in its facilities. *See* Dkt. 79 at 26, 28. Rather, Plaintiffs point to evidence that the relative decrease in vaccine efficacy against the highly contagious Delta variant, and instances of breakthrough infections among vaccinated caregivers, means that unvaccinated caregivers did not "pose[] a substantial risk over the vaccinated." Dkt. 79 at 25; *see also id.* at 20–23; Dkt. 65 at 34–35.

Plaintiffs' argument relies in part on the expert testimony of Dr. Harvey Risch, Professor Emeritus of Epidemiology at the Yale School of Public Health.[8] Dkt. 79 at 20; *see* Dkt. 67 at 24–47; 49–69; 211–18; 220–25. Most relevant to Plaintiffs' contention that accommodating unvaccinated caregivers did not pose substantial costs to PeaceHealth is Dr. Risch's comparison

---

[8] As noted above, PeaceHealth has moved to exclude Dr. Risch under Federal Rule of Evidence 702 on reliability and relevance grounds. Dkt. 66.

between the estimated number of unvaccinated PeaceHealth employees with religious

exemptions and national data on the rate of breakthrough infections among vaccinated

individuals. *See* Dkt. 67 at 60–62. Risch opines that even if all unvaccinated, exempt caregivers

contracted COVID-19, the infection risk burden would still be lower than the estimated number

of vaccinated caregivers expected to contract COVID-19 based on CDC data of breakthrough

infection cases between April 2021 to December 2021. *Id.* at 61. Thus, Risch concludes, "the

smaller infection risk load among the unvaccinated on-leave employees, including the Plaintiffs,

had they been granted religious exemption accommodations and remained employed in their

same jobs, cannot be claimed to create inordinate hardship, or working conditions that

Defendants were not already tolerating." *Id.* at 63.

The Court notes several issues with Dr. Risch's testimony. First, as this Court has ruled

before, Risch's conclusions about whether Defendant has established undue (or in this case,

"inordinate") hardship is an improper legal opinion. *Strandquist v. Washington State Dep't of

Soc. & Health Servs.*, No. 3:23-CV-05071-TMC, 2024 WL 4625337, at *4 (W.D. Wash. Oct. 30,

2024); *see also United States v. Diaz*, 876 F.3d 1194, 1197 (9th Cir. 2017) ("[A]n expert witness

cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law.")

(citation modified). Second, Risch's opinions are based largely on data obtained after

PeaceHealth's mid-August 2021 decision to place Plaintiffs on leave. *See, e.g.*, Dkt. 67 at 56

(citing 2022 studies that "by the latter half of 2021 and increasingly thereafter, two doses of the

COVID-19 vaccines in general use lost most of their ability to reduce risk of infection

transmission"); *id.* at 57 (using CDC's national vaccine breakthrough estimate of 4.3% through

the end of December 2021). As another court in this district has noted in evaluating Risch's

opinions, including his inclusion of breakthrough infection data after the adverse employment

action in question, "to judge the [Defendant's] undue hardship decision based on knowledge and

information developed after the fact would hold the [Defendant] to an impossible standard by applying the benefit of hindsight to the [Defendant's] decision." *Luxton v. Wash. State Dep't of Veterans Affs.*, No. 3:23-CV-05238-DGE, 2025 WL 896658, at *16 (W.D. Wash. Mar. 24, 2025) (citation omitted); *see also id.* at 6 n.3 (finding the breakthrough rate at the end of September 2021 would have been 1.64% using Risch's methodology if he had disregarded data reported after the relevant time period). Third, even viewing the evidence in the light most favorable to Plaintiffs, Risch's estimate of the number of exempt employees that required accommodations appears to undercount the total number of exempt employees across PeaceHealth's system. *See* Dkt. 67 at 60–61 (basing number of exempt employees on percentage of vaccinated caregivers in Northwest network as opposed to across PeaceHealth system); Dkt. 77 at 16–17 (acknowledging that the undercount between Dr. Risch's estimate and other snapshot PeaceHealth data produced in discovery was "nearly equivalent" and "very close.").

But even assuming that Risch's opinions are admissible (apart from his improper legal conclusion), they do not create a genuine dispute of fact about the substantial costs PeaceHealth would have faced by accommodating several hundred unvaccinated patient and caregiver-facing staff onsite. Risch posits that there would be 419 estimated breakthrough infections among hypothetical vaccinated PeaceHealth Washington caregivers, compared to 301 unvaccinated Washington-based caregivers, even assuming all unvaccinated caregivers were infected. Dkt. 67 at 61. But "Risch provides no information about the specific job duties and functions of the [419] hypothetical employees—a necessary predicate to comparing them with the duties, functions, and the interactions [Plaintiffs] would have." *Luxton*, 2025 WL 896658, at *16; *Shirley v. Washington State Dep't of Fish & Wildlife*, No. 3:23-CV-05077-DGE, 2025 WL 1384803, at *5 (W.D. Wash. May 13, 2025) (similar).

1    Even assuming these hypothetical vaccinated employees held roles involving patient

2    and/or caregiver duties in PeaceHealth facilities as Plaintiffs do, Risch's general comparison

3    does not account for the heightened risks to patients and caregivers posed by unvaccinated

4    caregivers at an *individual* level. *See Luxton*, 2025 WL 896658, at *16. Risch opines that, if the

5    total number of breakthrough infections were greater than infections among unvaccinated staff, a

6    hypothetical patient would be more likely to encounter a breakthrough infection. *See* Dkt. 67 at

7    61–62. But this does nothing to rebut PeaceHealth's evidence of the substantial increased risk of

8    infection from an unvaccinated caregiver to the specific patients with whom that caregiver

9    interacted. *See* Dkt. 71 ¶¶ 15–17. Nothing in Title VII requires PeaceHealth to disregard the

10   serious risk to the health and safety of those individual patients simply because, on a system-

11   wide level, there remained a comparable risk from breakthrough infections that could not be

12   eliminated even with required vaccination. In "relation to the conduct of its particular business,"

13   PeaceHealth has shown that an increased risk of infection among caregivers directly serving

14   medically-vulnerable patients or otherwise interacting with caregivers who were serving

15   vulnerable patients would result in "substantial increased costs." *Groff*, 600 U.S. at 470.

16   Even apart from the heightened risks to patient safety, an unvaccinated caregiver with a

17   greater risk of infection is more likely to be absent from work and, if infected, unable to return

18   for longer due to higher viral loads. *See* Dkt. 73 at 93; Dkt. 69 ¶¶ 24, 34; Dkt. 67 at 58. This was

19   especially relevant in the summer and fall of 2021 when PeaceHealth's overburdened hospital

20   system faced an unprecedented surge of COVID-19 cases and hospitalizations. Dkt. 73 at 182;

21   Dkt. 69 ¶ 34. PeaceHealth's "business" also included the health and safety of all its employees

22   and their related ability to be available for work. *See* Dkt. 72 at 13. PeaceHealth appropriately

23   determined that unvaccinated caregivers not only posed a greater risk of transmitting the virus to

24   their coworkers (because of the heightened risk of being infected in the first place), but also to

themselves given the greater likelihood of experiencing severe illness if unvaccinated. Dkt. 69 ¶ 23; Dkt. 78 at 19; *see Groff*, 600 U.S. at 472 (An "accommodation's effect on co-workers may have ramifications for the conduct of the employer's business[.]").

Relatedly, Plaintiffs point to data showing vaccinated (and, for a time) partially vaccinated caregivers continued to test positive at similar rates one month after the Vaccine Policy was implemented. Dkt. 65 at 33–35. Plaintiffs argue that breakthrough infections among vaccinated caregivers disprove "the notion that the unvaccinated presented an increased overall safety risk[.]" *Id.* at 34; *see* Dkt. 79 at 28 ("[D]espite PeaceHealth eliminating one numerically decreasing set of employees for safety purposes, it retained a numerically increasing set of employees who were testing positive in appreciable and larger numbers than the unvaccinated.")

But Plaintiffs again incorrectly equate instances of breakthrough infections among vaccinated caregivers with futility of a vaccine requirement. Because vaccinated (and for a brief period, partially vaccinated) caregivers were the only staff working onsite in September 2021, it is unsurprising that they would comprise most of the infections. *See* Dkt. 74 at 245–46. More importantly, PeaceHealth does not dispute that breakthrough infections in vaccinated staff occurred before the Vaccine Policy and after it was implemented. *See, e.g.*, Dkt. 72 at 45 (FAQ document stating that "some fully vaccinated people will become infected (breakthrough infection) and experience illness"); Dkt. 92 at 9. Rather, PeaceHealth's argument—and the evidence marshaled to support it—is that compared to vaccinated caregivers, unvaccinated caregivers were more likely to contract COVID-19, which in turn made them more likely to transmit the virus to patients or other caregivers, and experience more severe consequences from such infections. Dkt. 69 ¶ 23; Dkt. 78 at 19. Pointing out breakthrough infections among PeaceHealth's vaccinated staff does not contradict PeaceHealth's undue hardship analysis that "[a]ccommodating hundreds of employees refusing vaccination . . . who would then pose

heightened risks of getting infected and spreading COVID-19 further . . . among [PeaceHealth's] patient population and staff . . . would have imposed substantial costs[.]" *Williams*, 2024 WL 3993162, at *7.

Nor does Plaintiffs' assertion that post-infection natural immunity was as or more effective than vaccination-based immunity create a genuine dispute of material fact. *See* Dkt. 65 at 20. Six Plaintiff caregivers claim they had confirmed cases of COVID before August 31, 2021 and argue that PeaceHealth did not consider natural immunity as a reasonable accommodation. *See id.* Plaintiffs claim only that their "expert noted that post infection immunity was at least as effective at reducing the likelihood of getting the disease and decreasing transmission as vaccination immunity." *Id.* But beyond Plaintiffs' assertions, they offer no evidence to support their claims. *See id.* It is the nonmoving party's job "to identify with reasonable particularity the evidence that precludes summary judgment," and if it elects not to do so, the Court need not "scour the record in search of a genuine issue of triable fact[.]" *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citations omitted). And even if the Court evaluated Plaintiffs' claim on its merits, PeaceHealth has demonstrated that although it did consider the effect of natural immunity, at the time it formulated the Vaccine Policy, vaccination was still seen as providing superior protection. *See* Dkt. 80 at 10; Dkt. 83 ¶ 8; Dkt. 69 at 21–22.

Plaintiffs also argue that PeaceHealth did not participate in an interactive process with exempt Plaintiffs, including assessing the risks posed by individual Plaintiffs to determine whether other reasonable accommodations were available. Dkt. 79 at 25; Dkt. 65 at 18–20. Plaintiffs do not dispute that PeaceHealth established a process to review religious exception requests and that, if approved, the caregiver's HR partner and supervisor evaluated whether the caregiver could perform their job remotely. *See id.* at 18–19; Dkt. 72 ¶ 20. Rather, Plaintiffs claim that "PeaceHealth would not accommodate the 567 persons seeking religious or medical

exemptions and was unwilling to make any adjustments, even if reasonable through an interactive process." Dkt. 65 at 19.

The Court notes that Plaintiffs' assertion is contradicted by the evidence they produce in support of their argument. *Id.* ("Plaintiff Humphreys was given a remote position with reduced hours from January 17, 2022 through May 19, 2022[.]"). Plaintiffs' claim is further undermined by an email they cite referring to "unvaccinated TSP caregivers" that were "being allowed to continue to work under an exemption even though they are in positions that were identified as being required to have a presence onsite." Dkt. 80 at 162; *see also* Dkt. 65 at 30 (discussing email). Rather than showing no interactive process, the fact that TSP caregivers—who did not work fully remotely before the Vaccine Policy—and other exempt caregivers were accommodated with remote work shows that PeaceHealth did consider the risks and benefits of alternative accommodations for exempt employees. *See* Dkt. 85 ¶ 4; *Groff*, 600 U.S. at 473. Although Plaintiffs Kolbert, Ostapchuk, Yudin, Coffman, and Doornbos argue that they did not interact with patients and so should have been accommodated outside of administrative leave, *see* Dkt. 65 at 20, each of these Plaintiffs admitted in their depositions that their jobs required varying levels of patient and/or caregiver interactions at PeaceHealth facilities. *See supra* Sec. II.E. PeaceHealth appropriately concluded that allowing unvaccinated caregivers onsite—even those who interacted less often with patients and other caregivers—heightened risks of infections, transmissions, and deaths in its hospitals, and thus "would result in substantial increased costs[.]" *See Groff*, 600 U.S. at 470; *Bordeaux*, 703 F. Supp. 3d at 1135 (concluding on summary judgment that employer faced an undue hardship because "[a]ccommodating Plaintiff's [COVID-19 vaccine] exemption request would have put the lives of her fellow cast and crew members in danger"); *Lavelle-Hayden*, 744 F. Supp. 3d at 1159 (rejecting argument on summary judgment that "4% of employees remaining unvaccinated and taking other precautionary

measures" created an issue of fact for undue hardship defense when the "unrefuted evidence shows that a single unvaccinated employee in a breakroom during a lunch break could have compromised both employee and patient safety").

Plaintiffs next argue that PeaceHealth's decision to temporarily allow partially vaccinated caregivers to continue working onsite with additional precautions shows that accommodating unvaccinated caregivers would not have posed an undue burden. Dkt. 65 at 35; Dkt. 79 at 26–27. But Plaintiffs' argument fails to create an issue of fact for two reasons. First, partially vaccinated caregivers were accommodated onsite for no more than six weeks after September 1, 2021, to ensure sufficient staffing, and only if they had received one of a two-dose vaccine series they intended to complete. Dkt. 72 at 56; Dkt. 83 ¶ 7. Second, partial vaccination is not comparable to being unvaccinated because a single dose of the vaccine provided substantially greater protection against COVID-19 compared to no vaccination at all. Dkt. 83 ¶ 7; *see* Dkt. 73 at 99 (NEJM study of healthcare workers from June 30, 2021 comparing instances of infections among unvaccinated, partially, and fully vaccinated participants and the relative vaccine efficacy between fully and partially vaccinated healthcare workers).

Finally, Plaintiffs assert that "[e]ven if this Court finds that unpaid leave was appropriate to combat COVID-19 for some duration . . . Plaintiffs should have been allowed to return to work no later than October 31, 2022" when Washington's Emergency Proclamation ended. Dkt. 65 at 15. The Court first observes that as a private company, PeaceHealth was not legally obligated to eliminate its Vaccine Policy upon the Governor's rescission. *See* Dkt. 74 at 285 ("Whereas, some employers have chosen to implement a vaccination requirement as a condition of employment, subject to all applicable exemptions and accommodations required by law, even after the COVID-19 State of Emergency is lifted[.]") (emphasis removed). PeaceHealth has produced evidence that, while certain conditions evolved after the Vaccine

Policy was implemented—including a decline in hospitalizations due to the Delta variant and the emergence of the Omicron variant—the underlying health and safety risks attendant to patients and caregivers had not. Dkt. 73 ¶¶ 59–60; Dkt. 73 at 209 (February 2022 CDC report recommending vaccination and explaining that "benefits of the prevention of infection and associated hospitalization or death outweigh vaccine-associated risks"); Dkt. 74 at 286 (Governor's rescission of Emergency Proclamation acknowledging that "Department of Health statistics reflect the continued persistence of COVID-19 in the state, including continued hospitalizations and deaths due to COVID-19[.]"); *see* Dkt. 68 at 17 (federal vaccine requirement ended on June 5, 2023). In contrast, Plaintiffs have failed to produce evidence in the summary judgment record from which a reasonable factfinder could conclude that the health and safety risks the prompted PeaceHealth's Vaccine Policy abruptly ended on October 31, 2022. Because Plaintiffs fail to contradict PeaceHealth's evidence that accommodating hundreds of unvaccinated caregivers would have resulted in an undue burden, the Court GRANTS PeaceHealth's motion for summary judgment on this claim.

## C.    Disparate treatment under Title VII and WLAD

The parties move for summary judgment on Plaintiffs' disparate treatment claim under Title VII and the WLAD. Dkt. 65 at 6; Dkt. 68 at 5–6. Both parties analyze Plaintiffs' disparate treatment claim under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Dkt. 65 at 24; Dkt. 68 at 25. Because disparate treatment claims under both Title VII and the WLAD may use the *McDonnell Douglas* burden-shifting test, the Court will consider these claims together. *See Bartholomew v. Washington*, 693 F. Supp. 3d 1107, 1115 n.7 (W.D. Wash. 2023) (explaining that the WLAD and Title VII may "both use the McDonnell Douglas burden-shifting framework to establish whether a plaintiff has made a prima facie case of disparate treatment.") (citation omitted). Under this approach, Plaintiffs have

1    the burden of establishing a prima facie case of disparate treatment by showing that they (1) are

2    members of a protected class; (2) were qualified for their positions; (3) experienced an adverse

3    employment action; and (4) similarly situated individuals outside their protected class were

4    treated more favorably, or other circumstances surrounding the adverse employment action give

5    rise to an inference of discrimination. *Peterson*, 358 F.3d at 603. The parties focus their

6    arguments on the fourth element. *See* Dkt. 65 at 25–29; Dkt. 68 at 25–26.

7        Before turning to whether Plaintiffs have met their prima facie evidentiary burden under

8    the *McDonnell Douglas* test, the Court first addresses Plaintiffs' alternate argument that

9    "PeaceHealth's failure to accommodate is prima facie evidence of disparate treatment[.]" Dkt. 65

10   at 24. Although a "claim for religious discrimination under Title VII can be asserted under

11   several different theories, including disparate treatment and failure to accommodate," *Peterson*,

12   358 F.3d at 603 (citation omitted), the theories have "distinct elements." *Lavelle-Hayden*, 744 F.

13   Supp. 3d at 1149 (explaining the different elements to establish a prima facie disparate treatment

14   claim versus a prima facie failure to accommodate claim); *Bartholomew*, 693 F. Supp. 3d at 1116

15   n.8 (similar); *see Dykzeul v. Charter Commc'ns, Inc.*, CV 18-05826, 2019 WL 8198218, at *10

16   (C.D. Cal. Nov. 18, 2019) ("[I]t would be superfluous if the same facts supported liability under

17   Title VII for both failure to accommodate and disparate treatment.") (citation omitted). In any

18   case, the Court has found that PeaceHealth is entitled to summary judgment on Plaintiffs'

19   failure-to-accommodate claim, so it cannot be the basis for Plaintiffs' disparate treatment claim.

20   *See supra* Sec.III.B.

21       Plaintiffs fail to meet their prima facie burden to sustain a disparate treatment claim.

22   Plaintiffs do not identify any similarly situated individuals outside their protected class that

23   PeaceHealth treated more favorably. *See Peterson*, 358 F.3d at 603. Plaintiffs themselves have

24   argued that PeaceHealth treated religious and medical vaccine exemptions the same, including

with regard to the accommodations it offered. *See, e.g.*, Dkt. 51 ¶¶ 98, 130 (noting that PeaceHealth required all caregivers to be fully vaccinated); Dkt. 65 at 19 ("PeaceHealth would not accommodate the 567 persons seeking religious or medical exemptions and was unwilling to make any adjustments[.]"). PeaceHealth has also produced evidence that supports its equal treatment of exempt caregivers. *See, e.g.*, Dkt. 72 at 33 (email to PeaceHealth leaders explaining that all unvaccinated exempt caregivers could not work onsite after August 31, 2021 unless their job could be performed 100% remotely). Plaintiffs argue that medically exempt employees were nevertheless favored over religiously exempt employees because they were allowed to apply for medical leave through UNUM (PeaceHealth's third-party leave administrator) or use accumulated Extended Illness Bank ("EIB") while on administrative leave, whereas religiously exempt employees could not. Dkt. 79 at 34. But Plaintiffs offer no evidence that this distinction was based on disfavoring religious objectors. Rather, PeaceHealth produces evidence that medical leave or use of EIB time was only applicable for caregivers with medical conditions according to PeaceHealth's UNUM policy, which predated the Vaccine Policy. Dkt. 88 ¶ 8; *see Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1157 (9th Cir. 2010) (holding that similarly situated employees must be similar in "all material respects") (citation modified).

Plaintiffs also assert that "PeaceHealth allowed unvaccinated contractors onsite, including employees that were on leave of absence for their religious objection to the vaccine." Dkt. 79 at 34. PeaceHealth's Vaccine Policy extended to employees of all third-party contractors working onsite at PeaceHealth facilities. Dkt. 88 ¶ 5 ("It was PeaceHealth's expectation that employees of all third-party contractors working onsite at PeaceHealth facilities be vaccinated against COVID-19 in compliance with the Vaccination Policy."); Dkt. 80 at 142 (email noting that contractors who were "not fully vaccinated [would] be excluded from entering any PeaceHealth facilities.").

Plaintiffs cite to a declaration by Plaintiff Kristin Ellison who, after she was placed on administrative leave, began working for a different health care organization. Dkt. 79 at 34; Dkt. 81 ¶¶ 2–3. Ellison states that her new position required regular visits to a PeaceHealth facility to pick up and drop off specimens at a lab located onsite. *Id.*; Dkt. 81 ¶¶ 2–5. But Plaintiffs fail to demonstrate that Ellison's ability to access a PeaceHealth facility despite its stated policy shows that PeaceHealth "allowed" unvaccinated contractors onsite. *See* Dkt. 79 at 34. Nor does PeaceHealth's update in October 2021 that the organization was "working on registering an additional 3000 vendors" undercut their policy or intent that unvaccinated contractors would be subject to the same requirements as unvaccinated caregivers. *See* Dkt. 80 at 164–65 (noting that PeaceHealth "believe[d] []all [contractors to] be compliant" with the Vaccination Policy); Dkt. 79 at 36 (discussing update).

Plaintiffs' other attempts to identify favored comparator groups fare no better. Plaintiffs point out that PeaceHealth did not require patients and medically-necessary "support person[s]" to be vaccinated to enter PeaceHealth facilities. Dkt. 65 at 32–33. This argument is not only irrelevant for the purposes of a Title VII *employment* discrimination claim, *see Peterson*, 358 F.3d at 603, but PeaceHealth's inability to require vaccination among patients and medically-necessary visitors supports rather than undermines its decision to require vaccines among the individuals in its facilities over whom it did exercise control. Finally, Plaintiffs contend that "partially vaccinated persons [being] allowed to continue working on site" is evidence of disparate treatment. Dkt. 65 at 31. This argument fails for the same reason as in the undue hardship context—that partially vaccinated caregivers and unvaccinated caregivers are not "similarly situated." *See Hawn*, 615 F.3d at 1157; Dkt. 83 ¶ 7 (discussing decision to allow partially vaccinated workers to continue working temporarily).

1    Nor can Plaintiffs make their prima facie disparate treatment claim by showing that other

2  circumstances give rise to an inference of discrimination. In the Ninth Circuit, a plaintiff may

3  show "an inference of discrimination in whatever manner is appropriate in the particular

4  circumstances." *Hawn*, 615 F.3d at 1156 (citation omitted). To make their showing, Plaintiffs

5  must "produce direct or circumstantial evidence demonstrating that a discriminatory reason more

6  likely than not motivated the employer." *Opara v. Yellen*, 57 F.4th 709, 721 (9th Cir. 2023)

7  (citation omitted). Direct evidence has been defined as "conduct or statements by persons

8  involved in the decision-making process that may be viewed as directly reflecting the alleged

9  discriminatory attitude[.]" *Id.* at 723 (citation modified).

10    Plaintiffs claim that the Ethical Discernment process and statements made around

11  PeaceHealth's decision to require vaccination is direct evidence of PeaceHealth's discriminatory

12  purpose. *See* Dkt. 79 at 32. But Plaintiffs' arguments are conclusory and the evidence it cites

13  does not "directly reflect[] the alleged discriminatory attitude" toward religion. *See Opara*, 57

14  F.4th at 723 (citation omitted). Throughout Plaintiffs' briefing, they cite PeaceHealth statements

15  that it aligned its mission, vision, and values with its determination to require caregivers to be

16  vaccinated. *See, e.g.*, Dkt. 79 at 33 ("our Mission and Vision call us to act."); *id.* ("**[W]e believe**

17  the common good is a **moral imperative** that requires those who are medically able to get a

18  COVID-19 vaccine.") (emphasis added by Plaintiffs). But Plaintiffs cite no authority that a

19  private employer's statements of its own beliefs in favor of vaccination necessarily reflect

20  religious animus. *See* Dkt. 65 at 26–27; Dkt. 79 at 32–34. Moreover, as a religious organization,

21  PeaceHealth enjoys its own First Amendment right to exercise and express its religious beliefs.

22  *See, e.g.*, *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 709 (2014).

23    Plaintiffs also cannot show that statements made by PeaceHealth's leadership about

24  vaccine skepticism are evidence of religious animus. Plaintiffs reference Dr. Koekkoek's

explanation of a bulleted slide from the Ethical Discernment process during his deposition that PeaceHealth "want[s] caregivers who are following the best medical advice." Dkt. 80 at 14. Koekkoek explained that there was an open-ended discussion about whether caregivers that "were ignoring the best science that we have around vaccination, would [] also ignore science around other [medical] areas." Dkt. 80 at 14–15. Despite Plaintiffs' insistence, Koekkoek's statement does not present direct evidence of a "discriminatory attitude" towards religion. *See Opara*, 57 F.4th at 722. Construed in the light most favorable to Plaintiffs, Koekkoek's statement could reflect a bias against unvaccinated employees, but that is insufficient to infer discriminatory intent against a protected class. *See Gage v. Mayo Clinic*, 707 F. Supp. 3d 870, 883 (D. Ariz. 2023), *aff'd*, No. 23-4410, 2025 WL 1733503 (9th Cir. June 23, 2025) (dismissing disparate treatment claim on the basis of religion because plaintiff "only allege[d] that vaccinated employees were treated more favorably than unvaccinated employees . . . [and] has not alleged facts sufficient to suggest that this amounts to disparate treatments of Christians, or more favorable treatment of non-Christians[.]").

Plaintiffs' circumstantial evidence also fails to give rise to an inference of discrimination. *See Opara*, 57 F.4th at 709; Dkt. 65 at 26–29. Plaintiffs cite other instances that they argue show religiously exempt caregivers were disfavored compared to medically exempt caregivers. *See* Dkt. 74 at 27–28 (PeaceHealth's press release announcing the Vaccine Policy and only mentioning the possibility of medical exemptions); *see id.* at 226 (PeaceHealth Executive stating that it had "removed language around a religious exemption" from its Vaccine Policy after researching that there are "very few religions that prohibit vaccines," though still affirming it was "handling religious exemption requests on an individual level"); *id.* at 20–23 (FAQ on whether caregivers can submit a religious exemption that includes language that "[v]ery few religious denominations explicitly prohibit vaccinations[.]"). Even viewed cumulatively, these

statements do not demonstrate that "a discriminatory reason more likely than not motivated" PeaceHealth. *See Opara*, 57 F.4th at 722. As described above, the record demonstrates that unvaccinated employees, regardless of whether they received a religious or medical exemption, were treated the same. *See* Dkt. 72 at 33; *Matthews v. Legacy Health*, No. 6:24-CV-00592-MC, 2024 WL 3970794, at *3 (D. Or. Aug. 26, 2024) (dismissing plaintiff's religious disparate treatment claim because the record showed that the employer's vaccine mandate "applied to all employees and was enforced throughout the workplace").

Because Plaintiffs cannot support a prima facie case of disparate treatment, the Court GRANTS PeaceHealth summary judgment on this claim.

**D.      Disparate impact under Title VII and WLAD**

The parties also move for summary judgment on Plaintiffs' disparate impact claim under Title VII and the WLAD. Dkt. 65 at 6; Dkt. 68 at 5–6. To bring a Title VII disparate impact claim, Plaintiffs must show that a "facially neutral employment practice has a significantly discriminatory impact upon a group protected by Title VII." *Freyd v. Univ. of Oregon*, 990 F.3d 1211, 1224 (9th Cir. 2021) (quoting *Paige v. California*, 291 F.3d 1141, 1144 (9th Cir. 2002)). This showing requires that Plaintiffs demonstrate "1) a specific employment practice that 2) causes a significant discriminatory impact." *Id.* (quoting *Paige*, 291 F.3d at 1144). Plaintiffs must also establish that "the challenged practice is either (a) not job related or (b) '[in]consistent with business necessity.'" *Id.* (quoting 42 U.S.C. § 2000e-2(k)(1)(A)(i)). Because the "elements of a prima facie disparate impact claim under state and federal law are similar," the Court analyzes Plaintiffs' claims together. *See State v. City of Sunnyside*, 3 Wn.3d. 279, 315, 550 P.3d 31, 50 (Wash. 2024).

PeaceHealth contends that Plaintiffs' claim fails at the start because they cannot establish that they are a group protected by Title VII. Dkt. 68 at 27. In the operative complaint, Plaintiffs

identify that their group consists of "religious adherents with sincerely held religious beliefs against taking the vaccine." Dkt. 51 ¶¶ 105, 172. Plaintiffs alternatively argue in their briefing that "the existence of 53 Plaintiffs each alleging religious discrimination from the same employer, stemming from the same event (Vaccination Policy), clearly demonstrates that individuals who sought, and were denied, employment accommodations from the Vaccination Policy, for religious purposes, were impacted directly *and* disparately." Dkt. 65 at 26 (emphasis in original); *see also* Dkt. 79 at 32 ("In this case, an impact on 53 Plaintiffs is alone significant."). Finally, in their reply brief, Plaintiffs identify their protected class as consisting of "Christians." *See* Dkt. 89 at 14 ("These facts demonstrate that a disparate impact on Christians exists in this matter.").

District courts in the Ninth Circuit have consistently dismissed disparate impact claims when the plaintiff defines the protected class as simply those individuals who happen to share an individual religious belief that conflicts with the relevant employment practice. *See Matthews*, 2024 WL 3970794, at *3 (citation omitted); *see also Cox v. Nw. Reg'l Educ. Serv. Dist.*, Case No. 3:22-cv-01073-HZ, 2024 WL 777598, at *13 (D. Or. Feb. 23, 2024) (plaintiffs cannot establish a prima facie claim "by defining the group as comprised of religious individuals holding a particular belief they attribute to their religion even if other members of that individual's faith or religious group believe otherwise") (citation omitted); *Dunbar v. Walt Disney Co.*, No. CV 22-1075-DMG (JCX), 2022 WL 18357775, at *3 (C.D. Cal. July 25, 2022) (explaining that "[c]ourts generally treat disparate impact claims as those affecting particular groups or faiths, including articulable subgroups, but not all those who share a single common belief"); *Strandquist v. Washington State Dep't of Soc. & Health Servs.*, No. 3:23-CV-05071-TMC, 2024 WL 4645146, at *14 (W.D. Wash. Oct. 31, 2024) (concluding that plaintiff cannot show employer's vaccine mandate had a disparate impact on plaintiff's identified class of

Christians where plaintiff fails to show "that all Christians oppose vaccines or that non-vaccination is inherent in Christian beliefs").

Here, as in *Strandquist*, Plaintiffs do not put forward evidence that either all "religious adherents" or all Christians oppose vaccines "or that non-vaccination is inherent in Christian [or religious] beliefs." *Strandquist*, 2024 WL 4645146, at *14; *see* Dkt. 51 ¶ 7. Plaintiffs' attempt to articulate their protected class as comprising only the 53 Plaintiffs alleging religious discrimination from PeaceHealth's Vaccine Policy is itself imprecise, as it substantially undercounts the broader group—religious objectors to PeaceHealth's vaccine requirement who requested accommodations—that it is presumably a part of. *See* Dkt. 65 at 19. But what is consistent across these iterations is that Plaintiffs define their group so narrowly that it would afford them "nearly limitless" relief. *See Dunbar*, 2022 WL 18357775, at *3 (quoting *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 406 F. Supp. 3d 1258, 1306 (M.D. Ala. 2019), *aff'd*, 6 F.4th 1247 (11th Cir. 2021)). That is because "any policy impacting a plaintiff's specific religious belief would generally impact 100% of the members of a class defined by that belief, which would virtually always amount to a disproportionate impact as compared to those falling outside the class." *Id.* (quoting *Coral Ridge*, 306 F. Supp. 3d at 1306). Where, as here, Plaintiffs "have not identified a protected group, but rather simply the subgroup of religious individuals affected by the vaccine mandate[], there are no facts in the record from which a jury could find that the vaccine mandate[] resulted in a disparate impact on a group protected by Title VII." *See Cox.*, 2024 WL 777598, at *14. Accordingly, PeaceHealth is entitled to summary judgment on Plaintiffs' disparate impact claim.[9]

---

[9] Plaintiffs also argue that "PeaceHealth's failure to accommodate is prima facie evidence of . . . disparate impact." Dkt. 65 at 24. For the reasons already discussed in the disparate treatment context, Plaintiffs' failure-to-accommodate claim also does not provide a basis for Plaintiffs' disparate impact claim. *See supra* Sec.IV.C.

1

2

E.     **Hostile work environment under Title VII and WLAD**

        The parties next move for summary judgment on Plaintiffs' hostile work environment

claim under Title VII and the WLAD. Dkt. 65 at 6; Dkt. 68 at 6. "To allege a prima facie hostile

work environment [claim] based on religion, an employee needs to plead '(1) that he was

subjected to verbal or physical conduct of a harassing nature [based on his religion], (2) that this

conduct was unwelcome, and (3) that the conduct was sufficiently severe or pervasive to alter the

conditions of the victim's employment and create an abusive working environment.'"

*Bartholomew*, 693 F. Supp. 3d at 1116–17 (quoting *Kortan v. California Youth Auth.*, 217 F.3d

1104, 1110 (9th Cir. 2000)). The conduct alleged "must be both subjectively and objectively

hostile." *Id.* (citing *Hosea v. Donley*, 584 F. App'x 608, 611 (9th Cir. 2014)). A "hostile work

environment claim under the WLAD has substantially the same elements as a claim under Title

VII." *Knight v. Brown*, 797 F. Supp. 2d 1107, 1132 (W.D. Wash. 2011), *aff'd*, 485 F. App'x 183

(9th Cir. 2012) (citation omitted). Thus, the Court considers the claims together and its

conclusions apply to both Plaintiffs' Title VII and WLAD claims.

        Plaintiffs contend that they have "provided ample evidence" to support their prima facie

hostile work environment case. Dkt. 79 at 37; Dkt. 89 at 15 ("[T]he facts pled far exceed 'general

antipathy,' but show the pervasive and unwelcoming environment starting with the very top of

PeaceHealth[.]") (quoting Dkt. 82 at 24). PeaceHealth counters that Plaintiffs "offer only a

handful of stray comments," that most are directed at Plaintiffs' vaccination status, and that the

few that connect the unvaccinated with religion fall far short of the "severe or pervasive"

conduct required for a hostile work environment claim. Dkt. 82 at 23–24; Dkt. 92 at 13–15; *see*

*Bartholomew*, 693 F. Supp. 3d at 1116–17. The Court agrees with PeaceHealth.

        Even viewing the evidence in the light most favorable to Plaintiffs, most comments that

Plaintiffs allege were directed at or about them indicate animus towards their vaccination status,

not at their religion. *See, e.g.*, Dkt. 79 at 37 ("Plaintiff Aitchison was called 'selfish' and informed that she 'should know better' for refusing the vaccine."); *id.* at 37–38 ("Plaintiff Kolb reported negative comments regarding unvaccinated caregivers from a PeaceHealth Facebook page to the Chief Nursing Officer who . . . 'deleted comments that supported the unvaccinated staff and allowed the nasty comments from the vaccinated staff to remain on the site.'"); *id.* at 38 ("Plaintiff Krenzler was told that she did 'not believe in science, you will kill us.'"). Plaintiffs similarly cite to internal PeaceHealth emails tracking reports of "heated arguments between vaccinated and unvaccinated caregivers," Dkt. 74 at 145, or caregivers "acting in a manner toward their unvaccinated peers in a way that is outside of our value of respect," *id.* at 148, as evidence that PeaceHealth's leadership was "aware of the toxic environment but did little to address the issue," Dkt. 65 at 13.

But Plaintiffs cannot sustain a hostile work environment claim on such evidence. "[U]nvaccinated status alone does not establish any connotation of religious affiliation." *Brown v. NW Permanente, P.C.*, No. 3:22-CV-986-SI, 2023 WL 6147178, at *6 (D. Or. Sept. 20, 2023); *see also Pommier v. Kaiser Found. Health Plan of Washington*, No. C23-1409 TSZ, 2025 WL 346542, at *5 (W.D. Wash. Jan. 30, 2025) ("Hostile work environment claims must be based on harassment due to a protected characteristic, not an employee's vaccination status.") (citation omitted); *Feds for Freedom v. Austin*, No. 3:23-CV-05490 DGE-RJB, 2024 WL 2922804, at *11 (W.D. Wash. June 10, 2024) (dismissing hostile work environment claim where plaintiffs' allegations that they were "treated as pariahs, disease carriers and disease-spreaders" and subject to "intimidation, ridicule, and insult" failed to "demonstrate that their treatment was because of their religious beliefs and not because they were unvaccinated") (emphasis removed).

Plaintiffs have produced some evidence that plausibly connects comments about unvaccinated people with their religion, but they fail to rise to the level that would allow a

reasonable jury to find "sufficiently severe or pervasive" conduct. *Bartholomew*, 693 F. Supp. 3d

at 1117. "In analyzing the objective hostility of a working environment, [courts] look to the

totality of the circumstances surrounding the plaintiff's claim." *Okonowsky v. Garland*, 109 F.4th

1166, 1179 (9th Cir. 2024) (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270–71

(2001) (per curiam)). The Ninth Circuit has cautioned that "[i]n all cases, 'simple teasing,

offhand comments, and isolated incidents (unless extremely serious)' will not trigger Title VII's

protections." *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1988)).

Plaintiffs' evidence demonstrates, at most, that there was hostility to unvaccinated

caregivers, and that certain isolated incidents included a connotation of religion. Plaintiff Kolbert

alleged that after she told her manager about her religious objection to vaccination, her manager

said that she could "change [her] religion if [she] want[s] to." Dkt. 74 at 129. Plaintiff

Hoksbergen described an incident where coworkers joked that "they (management) should just

call it Jesus juice and make them (coworkers granted exemptions) take it." Dkt. 51-2 ¶ 10

(internal quotation marks omitted); Dkt. 74 at 136 (similar). And Plaintiff Telford described

another incident where "[c]oworkers laughed as they pretended to be Christians praying to a rock

on the side of the road imploring the rock to tell them what to do." Dkt. 74 at 136. But Plaintiffs'

evidence, without more, fails to rise above "offhand comments, and isolated incidents[,]" and is

not sufficient to establish a violation of Title VII. *See Okonowsky*, 109 F.4th at 1179.

Accordingly, PeaceHealth is entitled to summary judgment on Plaintiffs' hostile work

environment claim.

**F.    Injunctive relief**

Finally, PeaceHealth moves for summary judgment on Plaintiffs' claim for injunctive

relief against PeaceHealth's Vaccine Policy. Dkt. 68 at 6; Dkt. 51 ¶¶ 199–203. "[I]njunctive

relief is a remedy, not an independent cause of action." *McKee v. Gen. Motors Co.*, 601 F. Supp.

3d 901, 910 (W.D. Wash. 2022), *aff'd*, No. 22-35456, 2023 WL 7318690 (9th Cir. Nov. 7, 2023) (citation omitted). Because the Court has dismissed all of Plaintiffs' other claims, there is no underlying cause of action where injunctive relief could be granted. Thus, PeaceHealth is entitled to summary judgment.

## V. CONCLUSION

For the reasons explained above, the Court GRANTS Defendant PeaceHealth's motion for summary judgment (Dkt. 68) and DISMISSES Plaintiffs' claims with prejudice. Plaintiffs' cross-motion for partial summary judgment (Dkt. 65) is DENIED as moot. PeaceHealth's motion to exclude Plaintiffs' expert Dr. Harvey Risch under Federal Rule of Evidence 702 (Dkt. 66) is also DENIED as moot.

Dated this 26th day of August, 2025.

Tiffany M. Cartwright
United States District Judge